Bernard SUSSER et al., Plaintiffs,

v.

CARVEL CORPORATION et al.,
Defendants.

Lester N. MODICK et al., Plaintiffs,

v.

CARVEL STORES OF NEW YORK,
INC., et al., Defendants.

Martha M. McCOY et al., Plaintiffs,

v.

CARVEL CORPORATION et al.,
Defendants.

James OSSOLA et al., Plaintiffs,

v.

CARVEL STORES OF NEW YORK,
INC., et al., Defendants.

Joseph P. PHELAN, Plaintiff,

v.

CARVEL STORES OF NEW YORK,
INC., et al., Defendants.

James P. PIERCE et al., Plaintiffs,

v.

CARVEL STORES OF NEW YORK,
INC., et al., Defendants.

Matthew SEU et al., Plaintiffs,

v.

CARVEL CORPORATION et al.,
Defendants.

Paul S. GIBERMAN et al., Plaintiffs,

v.

CARVEL STORES OF NEW YORK,
INC., et al., Defendants.

Joseph PAZDRO et al., Plaintiffs,

v.

CARVEL STORES OF NEW YORK,
INC., et al., Defendants.

United States District Court
S. D. New York.
June 7, 1962.

Greenfield, Rothstein, Klein & Yarnell, New York City, for plaintiffs; Sidney W. Rothstein, Jules Yarnell, Joseph L. Klein, New York City, of counsel.

Amen, Weisman & Butler, New York City, for "Carvel" defendants; Herman L. Weisman, Herbert Roth, New York City, of counsel.

Shearman & Sterling, New York City, for defendant H. P. Hood & Sons, Inc.; John A. Wilson, New York City, of counsel.

Schneider & Lichtenstein, New York City, for defendant Mohawk Container Co.; Charles Lichtenstein, New York City, of counsel.

Albert L. Wigor, New York City, for defendant Eagle Cone Corp.; Paul J. Harriton, New York City, of counsel.

William G. Mulligan, New York City, for defendant Rakestraw's Dairy Products, Inc.; Eve M. Preminger, New York City, of counsel.

DAWSON, District Judge.

### I. General Nature of the Actions.

These are nine separate cases which were consolidated for trial. By consent of the parties the trial was held without a jury.

The plaintiffs in all cases are persons who are or were operators, under franchise agreements, of Carvel Dari-Freeze Stores at which "soft" ice cream was sold. Defendant Carvel Corporation and its subsidiaries issued the franchises, sold the basic equipment needed for operation of the stores and performed other related functions.[1] The other corporate defendants in the actions are the suppliers of various products such as ice cream mix, cones and paper goods used in connection with the dispensing of soft ice cream.[2] Also named as defendants were certain individuals who are or were officers or employees of Carvel.[3]

---

1. The following subsidiaries of Carvel Corporation, a New York corporation, are defendants in these cases: Carvel Stores of New York, Inc., a New York corporation; Carvel Dari-Freeze Stores, Inc., a New York corporation; Carvel Stores Realty Corporation, a New York corporation, now known as Chain Locations of America, Inc.; Carvehicle Corporation, a New York corporation; and Carvel Stores of Pennsylvania, a Pennsylvania corporaration. The name "Carvel" is used in this opinion as a general term of reference for any or all of the foregoing companies.

2. The non-Carvel corporate defendants consist of the following companies: Eagle Cone Corporation, a New York corpora-tion; H. P. Hood & Sons, Inc., a Massachusetts corporation; Mohawk Container Company, Inc., a New York corporation; and Rakestraw's Dairy Products, Inc., a Pennsylvania corporation. The non-Carvel corporate defendants are referred to in this opinion as the supplier defendants.

3. The actions as against these individuals, Thomas Carvel, Fred Vettel, Jr., George P. Clark, Robert J. Shallis, Agnes Carvel, Darrow Nutt, Ann M. McHugh, Stanley W. Townsend, Bruce Carvel, Mildred Arcadipane and Richard A. Cerosky, were dismissed by the Court on motion at the end of the case on the ground that no basis for any individual liability had been

The complaints in each of the cases set forth two fundamental causes of action. The first cause of action, based on a claim that the plaintiffs were induced to enter into their franchise agreements on the basis of certain fraudulent misrepresentations made by Carvel, was previously tried in a separate trial. The opinion of the Court which decided the fraud and deceit causes of action adversely to the plaintiffs was handed down on February 7, 1962. The present opinion relates to the second fundamental cause of action set forth in the complaints which claims treble damages for alleged violations of the antitrust laws on the part of the Carvel and the supplier defendants.

By the consent of all parties, as embodied in Pre-Trial Order No. 5, dated February 7, 1962, it was provided that a joint trial of the issues of liability under the antitrust laws be held, that the issue of liability be tried separately from the issue of damages, that plaintiffs were relying solely on alleged *per se* violations of the antitrust laws and that plaintiffs' evidence on the issue of liability would be limited to written agreements between the Carvel defendants and plaintiffs and other documents supplementary thereto or explanatory thereof, as well as written agreements between Carvel defendants and the supplier defendants and other documents supplementary thereto and explanatory thereof. At the trial, which was held in March, 1962, both sides relied primarily on documentary evidence to establish their case.

II. *Allegations of Unlawful Practices.*

In regard to the antitrust causes of action the complaints all contain certain common allegations. They allege that the defendants entered into an understanding and agreement during the period encompassed by the complaint and prior and subsequent thereto whereby:

1. The supplier defendants refused to sell their respective products direct to the Carvel franchise operators but would sell only through Carvel.

2. The Carvel defendants designed the franchise agreement so as to obligate and compel their franchise operators to deal solely and only with the supplier defendants.

3. The franchise operators were forbidden to deal in "competitive products," and

4. The operators were required to sell their products to the public at prices fixed by Carvel.

Rephrased in standard antitrust terminology, the complaint apparently alleges, as to the supplier defendants, a boycott under which they declined to make direct sales to the franchise operators. As to the Carvel defendants they are seemingly charged with (1) participation in the conspiratorial boycott against direct sales, (2) requiring, as a condition of obtaining the franchise and purchasing equipment, the use of the supplier defendants' products to the exclusion of the suppliers' competitors (tie-in), (3) forbidding the franchise operators from selling other than Carvel approved products (exclusive dealing), and (4) price fixing. These allegations will be taken up in order following a general discussion of the nature of the Carvel operation.

III. *Nature of the Carvel Operation and the Franchise System.*

Thomas Carvel, an individual defendant in some of the actions and president of the Carvel Corporation, went into the ice cream business in 1934. Over the succeeding years Mr. Carvel developed a freezer for dispensing "soft" ice cream, an ice cream mixture about the consistency of frozen custard. About 1948 the business established by Mr. Carvel had grown so substantially that two corporations, Carvel Corporation and Carvel Dari-Freeze Stores, Inc., were organized for the purpose of issuing franchises and selling freezers for the operation of soft ice cream stores under the Carvel name.

shown by the plaintiffs' evidence. The actions were also dismissed against Philip

Agree and Arthur Marciante, former attorneys for Carvel.

Thereafter, while the Carvel corporations operated some stores directly, most of their business related to the franchise operation. Each of the plaintiffs entered into agreements for the operation of a franchised Carvel Dari-Freeze ice cream store. The franchise operators conducted their businesses as independent contractors but were subjected to a number of restrictions which tended to create a uniform system of operation.

In some instances the franchisee erected his own store on premises subleased from Carvel. In other cases the franchisee leased a completed store as well as the land. All stores were constructed according to plans and specifications approved by Carvel. The ice cream sold by the stores is dispensed through certain machines designed by the defendants and bearing the Carvel name or trademark. The ice cream so dispensed is processed from an ice cream mix which the franchisee bought through Carvel from a dairy approved by Carvel. The mix is prepared from a special approved formula which was developed by Carvel and which is kept confidential by the dairies. Under the franchise agreements Carvel receives a royalty of twenty-five cents a gallon on the mix used in the machines.

The plaintiffs' franchise agreements require the franchisees to operate their stores in accordance with a Standard Operating Procedure Manual (SOP). This SOP regulates the business of the operators in a number of respects. It describes the products which the operators may sell at their store, the advertising which they may use, the color they must paint their store, the hours when they must put on their lights, the amount of insurance they must carry, the colors of their employees' uniforms, and many other details. To the public the individual franchise operator appears to be part of a national organization which manufactures and distributes a limited type of products of uniform quality. The Carvel SOP refers to each store as "an integral part of the chain."

There are approximately 400 Carvel Dari-Freeze stores presently in operation, extending from Maine to Florida and as far west as Wisconsin. The stores do an estimated gross business of between six to eight million dollars annually. Carvel's sales to the stores of equipment, ingredients and supplies reached a high of $5,532,396 in 1957 and in 1960 totalled $4,460,689.

The operation of franchise stores, of which Carvel is an example, is a comparatively recent development. Franchise stores differ from the older established chain store operations in which the managers of the stores were not independent operators.

The franchise method of operation has the advantage, from the standpoint of our American system of competitive economy, of enabling numerous groups of individuals with small capital to become entrepreneurs. The franchise business has had a phenomenal growth in the ice cream industry. If our economy had not developed that system of operation these individuals would have turned out to have been merely employees. The franchise system creates a class of independent businessmen; it provides the public with an opportunity to get a uniform product at numerous points of sale from small independent contractors, rather than from employees of a vast chain. The franchise system of operation is therefore good for the economy.

However, the cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product. This is well illustrated in the Carvel operation. The individual franchise to a dealer permits him to manufacture and sell Carvel ice cream from a store of uniform and distinctive design that has as an integral structural feature the Carvel crown and cone trademark erected on the roof as a prominent identifying mark. All stores are also identically unique in that they have a flat, slanting roof, the front portion of

the building consists only of glass walls and the name "Carvel" is displayed on each side in the form of neon signs over twelve feet in length and nearly three feet high. The building and the distinctive appurtenances thereto are protected by a design patent issued to Thomas Carvel. The ice cream is made and dispensed from a patented machine. Where the ice cream product which is sold to the public is such as would be placed in a paper container the name "Carvel" is written in script on the face of the container. Where it is necessary to provide a spoon with the ice cream product, as in the case of a sundae, the spoon used is distinctive and unique in design, with the Carvel crown and cone at the end or top of the handle and the name "Carvel" written in distinctive script on the handle of the spoon.

It is this uniformity of stores and operation, and this advertising and the knowledge of the public of the uniformity and quality of the product that draws the business to the Carvel operators. The name Carvel constitutes a trademark of great value to the defendant companies and to the franchise operators.

■ It is well established that the owner of a trademark may license its use to another without abandoning his trademark. However, a naked license agreement without supervisory control over the product is invalid. E. I. du Pont de Nemours & Co. v. Celanese Corp., 167 F.2d 484, at p. 489, 35 CCPA 1061, 3 A.L.R.2d 1213 (1948). The obligations of the trademark licensor were well expressed in Morse-Starrett Products Co. v. Steccone, 86 F.Supp. 796, at p. 805 (D.C.N.D.Cal.1949):

"* * * If the owner of a trademark wants to license the use thereof to another and still retain as his own the enjoyment of the rights stemming therefrom, he must do so in such a way that he maintains sufficient control over the nature and quality of the finished product, over the activities of the licensee, as will enable the licensor to sustain his

original position of guarantor to the public that the goods now bearing the trademark are of the same nature and quality as were the goods bearing the trademark before the licensing, or, that the mark now has the same meaning as far as the public is concerned as it did before the licensing."

The validity of the franchise agreements and the other agreements between Carvel and the operators must be judged in the light of this fundamental rule relating to the protection of trademarks and trade names.

■ As was stated in Coca-Cola Co. v. J. C. Butler & Sons, 229 F. 224, 232 (D.C.Ark.1916):

"* * * The trade-mark laws, like the patent laws, give the owner a monopoly which neither the Sherman Act nor any other act of Congress forbids. It would be a paradox to say that the exercise of a right, expressly granted by law, is unlawful."

IV. *Liability of the Supplier Defendants.*

The plaintiffs' case against the supplier defendants rests almost entirely upon the legality of the contracts of the supplier defendants with Carvel. The contracts are not uniform, but certain provisions are common to them, and the general charges made by plaintiffs are the same as respects all the supplier defendants.

The liability of the supplier defendants is predicated upon alleged unlawful conspiracies on the part of each of the supplier defendants with Carvel not to sell direct to the plaintiffs. The plaintiffs do not contend that the supplier defendants engaged in any common conspiracy with Carvel and with each other in furtherance of any illegal end. No evidence of any such conspiracy was offered; the plaintiffs relied on the agreements between Carvel and the supplier defendants to establish the unlawful conspiracies.

The contracts of the two dairy companies involved in this action, H. P. Hood

& Sons, Inc. ("Hood") and Rakestraw's Dairy Products, Inc. ("Rakestraw"), are substantially similar. Hood and Rakestraw each agreed to manufacture and sell to Carvel all the "Carvel Mix" required by Carvel dealers located in the respective geographical areas to be serviced by each of them.[4] Carvel agreed to purchase from the dairies all of its requirements of Carvel Mix for such stores. The supply contracts provided that Hood and Rakestraw should manufacture Carvel Mix according to a secret formula furnished by Carvel and that they would not disclose the formula to any unauthorized persons. In addition, Hood and Rakestraw agreed to "deliver only Carvel Mix to Carvel Stores, and no other ice cream mix or ice cream preparation of any kind." Deliveries of Carvel Mix were made by the dairies direct to the franchise operators.

■ It is difficult to see exactly what plaintiffs consider to be the illegality of the dairy companies' contractual arrangements with Carvel. The complaint alleges that the supplier defendants violated the antitrust laws by their refusal to deal direct with the plaintiffs. There is no allegation in the complaint that the provisions of the contracts under which the dairies agreed to furnish all of Carvel's requirements for Carvel Mix were illegal in themselves, and the plaintiffs failed to prove that such provisions were in fact illegal. See, Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1960); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948).

■ As to the alleged refusal to deal direct, certainly the plaintiffs had no right to purchase Carvel Mix, made pursuant to Carvel's secret formula, other than on the terms which Carvel prescribed. Carvel had the right to bind the dairy companies to manufacture this secret formula mix solely for its own use or for persons whom it might designate. No outsider or any of the plaintiffs, without Carvel's approval, had the right to require the dairy companies to sell them this special formula mix. This conclusion seems obvious.

The same conclusion applies to the contracts of the two other supplier defendants, Eagle Cone Corporation and Mohawk Container Co. Eagle Cone Corporation agreed to supply all of Carvel's requirements for certain special ice cream cones for the operators located in New York, Connecticut and Massachusetts. The Mohawk Container Co. contract was an agreement to sell in a six state territory certain paper products of an exclusive design which would be ordered by Carvel. These contracts were not shown to be in any way illegal, still less illegal *per se*. See Bascom Launder Corp. v. Telecoin Corp., 204 F.2d 331 (2d Cir.), cert. denied 345 U.S. 994, 73 S.Ct. 1133, 97 L.Ed. 1401 (1953).

As a second possible basis for liability, the plaintiffs appear to rely on the fact that the supplier defendants would not sell them ice cream mixes other than the Carvel Mix (in the case of the two dairy companies) or other than Carvel approved merchandise (in the case of the other supplier defendants). As previously mentioned, the Hood-Carvel supply contracts provided that Hood would deliver no ice cream preparation other than Carvel Mix to Carvel stores and the Rakestraw contracts contained similar provisions.[5]

Plaintiffs' argument that these provisions are illegal must fail for several reasons:

First, the argument assumes the illegality of Carvel's restrictions on using only Carvel Mix and other approved prod-

---

4. Hood delivered Carvel Mix to the stores of the plaintiffs in Massachusetts and Connecticut and Rakestraw made delivery to the plaintiffs located in Pennsylvania.

5. The contracts of Eagle Cone Corporation and Mohawk Container Co. contained no provision that these companies would not sell the operators non-Carvel approved merchandise and the plaintiffs failed to prove that any such policy existed independent of the contracts.

ucts in the franchised stores—an assumption that is rejected in a subsequent section of this opinion.

Secondly, the plaintiffs failed to prove that any of the supplier defendants were asked to make sales of unapproved merchandise and that they refused to do so.

Thirdly, even if the supplier defendants agreed with Carvel not to sell other than Carvel approved products to the franchise operators, such an agreement by two persons not in competition with each other would not have constituted an illegal boycott. Packard Motor Car Co. v. Webster Motor Car Co., 100 U.S.App.D.C. 161, 243 F.2d 418, cert. denied, 355 U.S. 822, 78 S.Ct. 29, 2 L.Ed.2d 38 (1957); Schwing Motor Co. v. Hudson Sales Corp., 138 F.Supp. 899 (D.Md.) aff'd per curiam 239 F.2d 176 (4th Cir., 1956), cert. denied 355 U.S. 823, 78 S.Ct. 30, 2 L.Ed.2d 38 (1957).

Finally, the plaintiffs made no showing that they could not obtain non-Carvel merchandise from other suppliers or that the refusal of the supplier defendants to sell them such merchandise deprived the plaintiffs of any access to these goods.

In conclusion, plaintiffs' evidence failed to make out any illegal conduct on the part of the supplier defendants and the case against them must therefore be dismissed.

V. *Validity of Requiring the Use of the Supplier Defendants' Products to the Exclusion of Others.*

In considering the particular violations of the antitrust laws charged against Carvel, it is necessary to distinguish between the arrangements that Carvel had with its operators prior to May 1, 1955, and the agreements entered into after that period. In 1954 the Federal Trade Commission made an investigation of Carvel's method of conducting its business. No complaint was ever issued and no formal hearings were ever held before

the Federal Trade Commission. However, Carvel retained counsel to review the manner of conducting its business operations and, on their advice, it revised its franchise agreements and other documents in a number of respects. Therefore it will be necessary to examine Carvel's method of doing business prior to May 1, 1955, as well as its present method of doing business. The plaintiffs in the Susser, McCoy, Mueller and Frederick cases entered into their franchise agreements prior to May 1, 1955. The plaintiffs in the other cases [6] all entered into their agreements after May 1, 1955.

The complaints allege that the Carvel defendants designed the franchise agreements to compel the franchise operators to deal only with the supplier defendants. The restrictive provision in the franchise agreements entered into prior to May, 1955 was as follows:

"4. The Operator does hereby agree during the life of this Franchise Contract as follows:

\* \* \* \* \* \*

"(c) To purchase only Carvel Special Formula Mix from a source of supply designated by Carvel.

"(d) To purchase from Carvel all equipment necessary for the operation of the Store at Carvel standard prices and to pay for same on terms as agreed between the parties hereto in separate Sales Contract attached hereto and made part hereof.

"(e) To purchase and use only standard Carvel approved printed paper goods, napkins, cones, extracts, spoons, and all other Carvel products at standard market prices."

The post-1955 franchise agreements contain the following provisions:

"SIXTH: In order to safeguard the integrity of the Carvel trademarks, the Dealer agrees that he will purchase from Carvel or from

---

**6.** Modick, Ossola, Phelan, Pierce, Rodens, Seu, Pazdro and Giberman. (The cases involving the plaintiffs Pierce, Mueller, Frederick and Rodens, which were begun in the Eastern District of Pennsylvania, were consolidated before being transferred to this court. This accounts for the reference to twelve names of plaintiffs in the nine cases covered by this opinion).

approved sources designated by Carvel, his entire requirements of Carvel's Frozen Dairy Product mix, toppings, flavorings and other ingredients, cones and any other items sold as a part of the end product that is offered for consumption to the retail purchaser as scheduled in the Standard Operating Procedure Manual. * * *

\* \* \* \* \* \*

"NINTH: In connection with the operation of a Carvel Store and to comply with the specifications set forth in the Manual, the Dealer is required to purchase various items of machinery and equipment, and paper goods, a list of which is set forth in the Manual. To the extent that Carvel is able to supply the same, the Dealer shall have the right to purchase such machinery, equipment and paper goods, if he so desires, from Carvel, at prices fixed by Carvel from time to time. The Dealer's obligation under this paragraph is satisfied so long as the Dealer equips his store and keeps it maintained in accordance with the specifications contained in the Manual. In the event that the Dealer desires to purchase his printed paper goods from sources other than Carvel, Carvel shall license manufacturers of such products to print the Carvel name thereon in connection with sales to the Dealer, with products made in accordance with Carvel standards."

The first problem to be considered is whether Carvel may lawfully require the franchise operators who purchase freez-

ers [7] from Carvel "to purchase only Carvel Special Formula Mix from a source of supply designated by Carvel." In this respect the pre-1955 agreements and the post-1955 are substantially similar. The sources of supply which Carvel designated were various dairies, two of which, Hood and Rakestraw, are defendants in these actions. The provision in the franchise agreements which operates to obligate the dealers to purchase Carvel Special Formula Mix from these defendants is attacked by the plaintiffs as an unlawful tie-in under Section 1 of the Sherman Act and Section 3 of the Clayton Act, 15 U.S.C.A. §§ 1, 14.

It is doubtful whether Section 3 of the Clayton Act is applicable to the kind of restriction here involved. Section 3 prohibits restrictions in sales or leases preventing the use of goods or other commodities of "a competitor or competitors of the lessor or seller." Since Carvel, which has imposed the restriction, does not itself manufacture ice cream mix, it is doubtful whether dairy companies producing ice cream mix can be considered "competitors" of Carvel so as to bring Section 3 into application. However, it is unnecessary to resolve this question since the arrangement here involved is not of the type which could be held illegal under the provisions of either Section 1 of the Sherman Act or Section 3 of the Clayton Act.

The plaintiffs rely on a number of cases in which various tie-in arrangements have been held illegal under the antitrust laws. It is true that "tying agreements fare harshly under the laws forbidding restraints of trade." Times-Picayune Publishing Co. v. United States,

---

7. It is not altogether clear in Carvel's arrangements with its operators what the tying device may be considered to be and what product or products are alleged to be tied in. Logically the franchise, which is basic to the entire operation, or the dispensing freezers sold by Carvel, would seem to be the tying articles with the mix and accessory products tied in. Plaintiffs in their post trial brief do not assert that the franchise is a tying device but advance the theory that in addition to the freezers the front assembly plate for the freezers (which happens to be patented and which is leased to the operators) is a tying article. This attempt to bring in an incidental patented article as a tying device as to which "dominance" may be presumed is unrealistic and cannot be accepted. This opinion proceeds on the basis of plaintiffs' other contention that the dispensing freezers sold by Carvel are the tying articles.

345 U.S. 594, 606, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The following cases illustrate types of tie-ins which have been condemned. United Shoe Machinery Corp. v. United States, 258 U.S. 451, 42 S.Ct. 363, 66 L.Ed. 708 (1922) (lease of patented machines on condition that leased machinery should not be used with shoes upon which certain other operations had not been performed on other machines of the lessor and on condition that lessee should purchase supplies exclusively from the lessor); International Business Machines Corp. v. United States, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085 (1936) (lease of patented tabulating machines on condition that lessees should use with such machines only patented tabulating cards also manufactured by the lessor); Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944) (use of patent license to tie in unpatented element); International Salt Co. v. United States, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20 (1947) (lease of patented salt machines on condition that all salt consumed in the machines be purchased from lessor); Northern Pacific Ry. Co. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (sale of land with preferential routing conditions); United States v. General Motors Corp., 121 F.2d 376 (7th Cir. 1941) (requiring purchasers to deal with finance companies controlled by the automobile manufacturer).

The plaintiffs are unable to bring themselves under these cases for a number of reasons.

First of all, none of the cases in which tie-ins were held illegal involved the sale of products to the public under the trademark of the person imposing the restriction. The right of the franchisees to use the Carvel trademark was undoubtedly a valuable property right which, because it had been extensively advertised, and was associated with a particular product, had generated considerable good will. It is well settled that the licensor of a trademark not only is justified in imposing restrictions on his licensee but, indeed, is obligated to do so in order to make the license a valid one. See, e. g., Arthur Murray, Inc. v. Horst, 110 F. Supp. 678 (D.Mass.1953) (license to use name "Arthur Murray" conditioned upon agreement to employ only dancing instructors trained in the "Arthur Murray method"). In The Coca-Cola Bottling Co. v. The Coca-Cola Co., 269 F. 796 (D. Del.1920) it was held that an agreement to buy Coca-Cola syrup exclusively from the manufacturer and, in consideration of the right to use the Coca-Cola trademark, not to sell substitute or imitation products, was not violative of the Clayton or Sherman acts.

■ The rationale of these latter cases applies here. Carvel, which had developed a secret formula for ice cream mix, was justified in requiring the operators to use this mix in making sales to the public under the Carvel name. The end product which was sold to the public *was Carvel ice cream,* and it was this product to which the Carvel trademark and good will attached. The restrictions imposed by Carvel fall within the permissible limits approved in F. T. C. v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1923). In that case Sinclair, a refiner of gasoline, leased underground tanks and gasoline pumps to retail dealers on the condition that the equipment should be used only with gasoline supplied by the lessor. The Supreme Court held that no violation of the Clayton Act was involved.[8]

In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 607, 73 S. Ct. 872, 97 L.Ed. 1277 (1953), the Court explained the significance of the Sinclair case by pointing out that there "the arrangement merely prevented lessees from dispensing other types of gasoline through the lessor's brand pumps

---

8.  See Standard Oil Co. v. FTC, 273 F. 478, at 481, 17 A.L.R. 389 (2d Cir. 1921)— "It is unfair and dishonest to give out from a pump bearing one brand another maker's oil * * *."

and was thus viewed as a means of protecting the good-will of the lessor's branded gas." On the authority of the Sinclair case it is clear that Carvel has the legitimate right to require that only its special formula mix be dispensed from the machines and equipment sold to the franchise operators which bear the Carvel trademark. See also Pick Mfg. Co. v. General Motors Corp., 80 F.2d 641 (7th Cir. 1935), aff'd per curiam, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936), in which a contract of an automobile manufacturer with a dealer that the dealer would not sell or use in the repair of any of the manufacturer's vehicles any part not manufactured or authorized by the automobile manufacturer was held not to violate the antitrust laws.

■ As regards the accessory products such as toppings, cones and paper goods, these products are so closely related to the ice cream mix that Carvel is entitled to designate approved sources of supply as the franchise agreements provide. To require Carvel to limit itself to advance specifications of standards for all the various types of accessory products used in connection with the mix would impose an impractical and unreasonable burden of formulation and policing and is not required by the antitrust laws. It is to be noted however that the agreements indicate that Carvel would approve the use of accessory supplies from alternate sources of supply if an adequate check on standards could be maintained. In this there is no violation. See Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 306, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). There was no indication that Carvel reaped any profit itself from any of the tie-ins.

■ In any event, it is plain that the restraints in the nature of tie-ins which are attacked by the plaintiffs cannot be declared per se illegal, which is the only type of illegality on which the plaintiffs rely. The extent to which tie-ins

may be regarded as per se illegal under the antitrust laws is far from clear. See Turner, "Validity of Tying Arrangements Under the Antitrust Laws," 72 Harv.L.Rev. 50–75 (1958). Certainly in this case no per se illegality was demonstrated. The plaintiffs made no showing, as ordinarily required under the cases, that Carvel occupies a dominant position as a franchiser of soft ice cream or seller of ice cream freezers, or even that a substantial amount of commerce in the "tied" products was foreclosed. In the absence of these facts there is no basis for recovery. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

VI. *Prohibition of Sale of Non-Carvel Products.*

The franchise agreements entered into prior to May 1955 provided in Paragraph 4 that the operator agreed

"(a) To maintain, conduct and operate a Carvel Store at the premises hereinafter mentioned conforming in all respects to the Carvel Methods, Operating Techniques and Standards and to sell therein only frozen dairy products established as standard products in Carvel Stores. All operating techniques and standards shall be subject to change by Carvel upon notice to Operator.

"(b) That all merchandise purchased in said Store shall be under the Carvel label, established as such by Carvel, and Operator is to refrain from selling or dealing in any other products unless otherwise designated by Carvel."

The franchise agreements entered into after May 1955 provide that

"The Dealer agrees to sell at the Carvel Store, Carvel's Frozen Dairy Product solely in accordance with the [Standard Operating Procedure] Manual and will sell no other product except as hereinafter expressly otherwise provided." [9]

---

9. Both forms of franchise agreement permitted the operator to install one soft drink cup dispensing machine and one cigarette vending machine at the outside of the store only.

The allegation that the franchise operators are prohibited by the foregoing provisions from dealing in other than Carvel products on their store premises presents a separate problem from that of tie-ins, although such "exclusive dealing" involves related issues and has also been attacked under Section 3 of the Clayton Act as well as other antitrust laws.[10] There is no dispute that Carvel enforced the exclusive dealing provisions by notifying certain of the franchise operators to discontinue selling unauthorized merchandise and, in a few instances, brought suits to enjoin such violations of the franchise agreements.

Any consideration of the legality of Carvel's exclusive dealing arrangements with the franchise operators must involve an appraisal of the effect of the decision in the Standard Stations case, Standard Oil Co. of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). The contracts involved in that case required the dealer to purchase from Standard all his requirements of one or more products, and in the fields which they covered, petroleum products and accessories, competitors were effectively excluded. These arrangments were held illegal.

■ There are several facts here which distinguish the position of the Carvel franchise operators from that of the dealers involved in the Standard Stations case. A distinction must be drawn first of all between the requirement that the franchise operators not sell competing brands of ice cream and the prohibition that the franchise operators not sell other types of products, such as hamburgers and coffee, completely outside the competitive ice cream line. The latter type of restriction was not in-volved in the Standard Stations case, nor could such a restriction be held illegal under Section 3 of the Clayton Act since there is no competition between Carvel's products and products outside the ice cream field. Section 3 of the Clayton Act prevents a seller or lessor from prohibiting his purchaser or lessee from dealing in the goods of "a competitor or competitors of the lessor or seller," but this prohibition is not applicable to Carvel's restriction on the sale of goods outside the ice cream line since Carvel is not competing with such goods.

No case has been found under any of the antitrust laws holding that the franchiser of a valuable trademark cannot restrict the line of the business operated by his franchisee. Carvel is in the business of franchising ice cream dealers and should not be forced by the operators to enter into or lend its name to other lines of business. Naturally any food products sold on the premises in a store of uniform specifications and displaying the Carvel sign would be attributed to Carvel. Any defects in quality, over which Carvel would have no control, would detract from the Carvel name and good will. Carvel is not, by these restrictions, taking any business for itself at the expense of its competitors and no injury to competition is shown.

■ The problem of whether the dealers may lawfully be prohibited from selling ice cream products which compete with the Carvel line is a closer question, in view of the decision in Standard Stations, but even here there are reasons why Carvel's restrictions should be sustained. The factual situation involved here is different from that in Standard Stations where the agreements "contained provisions which, both

10. As with tie-ins, a number of cases have held certain kinds of exclusive dealing arrangements to be illegal. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 42 S.Ct. 360, 66 L.Ed. 653 (1922) (agreement requiring purchaser of dress patterns not to deal in patterns of the seller's competitor); F. T. C. v. Motion Picture Advertising Service Co., 344 U.S. 392, 73 S.Ct. 361, 97 L.Ed. 426 (1953) (contract prohibiting showing of competitors films); Dictograph Products v. F. T. C., 217 F.2d 821 (2d Cir. 1954), cert. denied, 349 U.S. 940, 75 S.Ct. 784, 99 L.Ed. 1268 (1955) (restricting hearing aid dealers from selling products of competitors).

by the language used and the limitations of liability, stressed the character of the agreement as seeking to establish the dealer as an independent contractor." United States v. Standard Oil Co., 78 F. Supp. 850, 855 (S.D.Calif.1948) aff'd, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949). The dealers were little more than wholesale purchasers of Standard's products and they were not part of a closely controlled franchise operation where the operators function in many respects as an integral part of the entire Carvel operation. Standard Oil's method of operation was to sell its own products to its dealers, but the ice cream mix and accessory products which, as a technical matter, are sold through Carvel, are not produced by Carvel. Carvel is in the business of franchising stores; it is not in the business of manufacturing ice cream mix, cones or napkins. The exclusive dealing provisions as to these products are aimed primarily at control of quality and are not part of a design by Carvel to monopolize business in any of these fields. Under these circumstances the exclusive dealing provisions in Carvel's franchise agreements are not violative of the antitrust laws. See, Pick Mfg. Co. v. General Motors Corp., 80 F. 2d 641 (7th Cir. 1935) aff'd per curiam, 299 U.S. 3, 57 S.Ct. 1, 81 L.Ed. 4 (1936); Boro Hall Corp. v. General Motors Corp., 124 F.2d 822 (2d Cir. 1942); cf., Arthur Murray, Inc. v. Horst, 110 F.Supp. 678 (D.Mass.1953).

As a practical matter, it may be noted that there is no evidence that the Carvel operators are particularly interested in selling other kinds of ice cream. The testimony that was given during the trial of the fraud aspect of these cases indicated that the operators were more concerned with expanding their line of business into other fields than with selling additional brands of ice cream.[11]

■ In any event, since the plaintiffs have voluntarily limited themselves to *per se* violations, they cannot succeed in their attack upon the exclusive dealing provisions in the franchise agreements. It is plain that exclusive dealing provisions, although they may be illegal under certain circumstances, are not illegal *per se*. Bascom Launder Corp. v. Telecoin Corp., 204 F.2d 331 (2d Cir.), cert. denied, 345 U.S. 994, 73 S.Ct. 1133, 97 L. Ed. 1401 (1953). They can only be held illegal if, within a relevant market, they substantially lessen competition. The plaintiffs, presumably in accordance with their *per se* theory of illegality, offered no evidence as to the relevant market nor did they show that competition was substantially lessened. On this record the plaintiffs have not made out a case for relief.

VII. *Validity of Pricing Provisions in the Franchise Agreements.*

The challenged pricing clause in the franchise agreements used *prior to May 1955* required the operator "to maintain prices on products designated in, and as per Carvel Standard Operating Procedure and not to conduct any reduced price sales of these items without written consent from Carvel." Section "J" of the pre-1955 SOP provided for certain stated "standard selling prices" which were established by Carvel. Section "K" of the early SOP, entitled "General Information," contained the following sentence: "In the event that you plan a special sale or promotion other than those planned by your company, it is necessary to secure permission to sell merchandise at a price below the standard permitted." These provisions show clearly that the prices at which ice cream was sold to the public were set by Carvel and not by the operators.

■ It has been established beyond any possibility of dispute that agreements fixing prices are illegal *per se* under Section 1 of the Sherman Act. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); United States v. Trenton Potteries Co., 273 U.S. 392, 47 S.Ct. 377,

---

11. One complained of his inability to sell hamburgers; one complained that he could not use the premises to sell Christmas trees.

71 L.Ed. 700 (1927). "Where such restraints are established, in purpose or in effect, inquiry under the Rule of Reason ends." Report of the Attorney General's National Committee to Study the Antitrust Laws, 12 (1955).

The facts of the present case afford no basis for approval of Carvel's policies under the doctrine of United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919), since here there is no unilateral refusal to deal but a direct agreement between the defendant and its franchisees setting the prices at which ice cream products may be sold. The defendants do not attempt to justify their agreements under state or federal fair trade laws; presumably because they recognize that no "resale" product is involved.

Carvel does urge that its pre-1955 price restrictions on its franchisees should be upheld as ancillary to the license of its trademark and the lease of the patented front plate for the dispensing machine. The contention is made that the price agreements should be sustained by extension of the principle announced in United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362 (1926), where it was held that a patentee who grants a license to make, use and sell the patented articles might fix the sales price "provided the conditions of sale are normally and reasonably adapted to secure pecuniary reward for the patentee's monopoly." 272 U.S. 476, 490, 47 S.Ct. 192, 197. The defendant relies for authority on Straight Side Basket Corp. v. Webster Basket Co., 82 F.2d 245 (2d Cir. 1936) to support the extension.

In the present state of antitrust law the defendant is unable to justify its actions under those cases. Insofar as the Webster case extended the principle of the General Electric case to permit price fixing of unpatented products of a patented machine it must probably be regarded as unsound. Barber-Colman Co. v. National Tool Co., 136 F.2d 339 (6th Cir. 1943); Cummer-Graham Co. v. Straight Side Basket Corp., 142 F.2d 646 (5th Cir. 1944); American Equip. Co. v. Tuthill Bldg. Material Co., 69 F.2d 406 (7th Cir. 1934). Indeed, the General Electric doctrine itself is of such uncertain continuing validity that any extension of it at this time must be regarded as unwarranted. See United States v. Line Material Co., 333 U.S. 287, 68 S. Ct. 550, 92 L.Ed. 701 (1948). The fact that the ice cream mix may have been made with a secret formula is of no consequence. Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S. Ct. 376, 55 L.Ed. 502 (1911).

The cases outlawing price fixing have been so sweeping that there would appear to be no room for saying that even in as closely controlled a franchise situation as Carvel maintains, price fixing may be justified as ancillary to a valid business operation. While variable prices in different stores might conceivably jeopardize Carvel's good will and trademark interests, it is plain that absent any claim of statutory protection under the fair trade laws the price fixing provisions in the pre-1955 agreements must, under well-established case law, be held illegal. The fact that in 1955 Carvel radically changed these provisions of its agreements, presumably on the advice of counsel following the FTC investigation, shows that Carvel itself recognized the dubious status of these provisions.

The revised "Dealer's Franchise Agreement," which was adopted by Carvel *after May, 1955* and is still being used (with minor changes not here relevant), contains altogether different price provisions from the earlier agreements. Paragraph Eighth provides as follows:

"The Dealer shall have the right to sell Carvel's Frozen Dairy Product and/or other items authorized for sale by him under the terms of this agreement at any price that the Dealer determines. Wherever Carvel recommends a retail price, such recommendation is based upon Carvel's experience concerning all factors that enter into a proper price,

but such recommendation is in no manner binding upon the Dealer."

The revised SOP for the post-1955 period changed the reference in the earlier manual from "standard selling price" to "recommended selling price."

Section "K" of the SOP which prior to May 1955 contained a provision that it was "necessary" on special sales to secure permission to sell at other than standard prices, was changed to read:

"In the event that you plan a special sale or promotion other than those planned by your company, it is suggested that you secure permission to sell merchandise at a price below the standard permitted."

By letter dated February 27, 1956, the operators with agreements signed prior to May 1955 [12] were formally notified of Carvel's changes in pricing policy. The letter, in relevant part, read as follows:

"All references in your agreement and/or the Standard Operating Procedure to the retail prices of Carvel's Frozen Dairy Products, in its various forms, are deemed to be references to *recommended* prices only. Those prices are based upon your company's considerable experience, and the sincere conviction that the price so recommended is both acceptable to the public, and profitable to your operation. However, you are entirely at liberty to vary these prices if you so desire and we disclaim any intention to control your retail prices."

There was no evidence that after February 27, 1956 Carvel imposed on any of the franchise operators any duty to maintain given prices. In fact in this later period Carvel prepared advertising signs and posters in which prices were left blank, or on which stickers could be pasted with various prices selected by the operators. Certain correspondence which was introduced in evidence also supported the fact that Carvel had abandoned its earlier price maintenance policy. One of the plaintiffs' own items of evidence, a letter from Carvel dated September 3, 1957, which went out to all operators stated: "Our supply department has blank signs to use should you care to increase or decrease your prices."

■ There is no convincing evidence that the dealers do not presently have the right to fix their own sale prices to the public without penalty by Carvel. In the absence of any attempt by Carvel to impose a binding price structure, the fact that Carvel announced a schedule of suggested prices is not illegal. See Maple Flooring Mfrs' Ass'n v. United States, 268 U.S. 563, 45 S.Ct. 578, 69 L. Ed. 1093 (1925); Cement Mfrs' Protective Ass'n v. United States, 268 U.S. 588, 45 S.Ct. 586, 69 L.Ed. 1104 (1925).

In conclusion, the price fixing provisions in the franchise agreements between Carvel and the plaintiffs in the Susser, McCoy, Mueller and Frederick cases were illegal and the illegality in each case extended from the dates on which the respective agreements were signed [13] until Carvel formally released the operators from such price fixing provisions on February 27, 1956. Damages for such periods of illegality may be recovered to the extent proved in these four cases in a subsequent trial, subject to the application of the statute of limitations as subsequently discussed. The plaintiffs in the other cases have no cause of action for illegal price fixing since they entered into their agreements after May 1, 1955 and there was no proof

12. The plaintiffs in the Susser, McCoy, Mueller and Frederick cases are in this category. (Although the date of the plaintiff Rodens' franchise agreement is April 11, 1955, the form of the agreement is that which was stipulated to have been used by Carvel after May 1, 1955).

13. The relevant dates in these four cases are as follows:

| Plaintiff | Date of Franchise |
| --- | --- |
| Susser | 7/17/54 |
| McCoy | 10/30/54 |
| Mueller | 2/24/54 |
| Frederick | 2/11/53 |

that Carvel ever compelled such operators to maintain fixed prices.

## VIII. *General Defenses Raised by Carvel.*

### A. Alleged Lack of Federal Jurisdiction

Carvel, as a general defense to all claims against it, asserts that federal jurisdiction is lacking because the restraints relied on by the plaintiffs do not involve, directly affect, or substantially obstruct interstate commerce.[14]

It is not disputed that Carvel itself is engaged in interstate commerce. Indeed it could hardly be argued otherwise, considering the fact that Carvel is engaged in the business of franchising stores and selling equipment in at least six states and that approximately 400 stores are in operation in these states under the Carvel name.

Carvel urges, however, that the plaintiffs are not engaged in interstate commerce and, since the restraints under attack apply to the operators' businesses, no basis for federal jurisdiction exists. The argument states that even if some of the materials which the operators use moves to them in interstate commerce such materials come to rest at the retailer's establishment, and are thereafter manufactured and transformed into the finished products which are sold to the public in purely intrastate transactions. See Page v. Work, 290 F.2d 323 (9th Cir. 1961); Brosious v. Pepsi-Cola Co., 155 F.2d 99 (3d Cir. 1945).

■■ Whatever might be the validity of the defendants' argument if the restrictions involved were imposed on an isolated dealer, it is clear that where they form part of Carvel's general policy of conducting its business, interstate commerce is so affected as to give this Court jurisdiction. The restrictions pertain not merely to the way in which the plaintiffs conduct their business but also to the way in which Carvel conducts its business. In this light it is obvious that the requisite effect on interstate commerce is present. See United States v. Rock Royal Co-Operative, Inc., 307 U.S. 533, 568–569, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); United States v. Standard Oil Co., 78 F.Supp. 850, 864–865 (S.D.Calif. 1948), aff'd 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371 (1949).

### B. Defense of the Statute of Limitations

■■ ■■ Section 15b of Title 15, U.S.C.A. provides that private treble damage suits are barred "unless commenced within four years after the cause of action accrued." Since the alleged violations on which the plaintiffs rely resulted from certain restrictive provisions in their franchise agreements, their cause of action first accrued at the time when the agreements were signed. If the plaintiffs' causes of action "accrued" for all purposes within the meaning of 15 U.S.C.A. § 15b at the date of the franchise agreements, then the plaintiffs in the Susser, McCoy, Phelan, Frederick, Mueller and Giberman cases would be barred from maintaining this suit because their actions were not commenced until more than four years after they entered into their franchise agreements.[15] However, as the plaintiffs point out, the defendants' actions were part of a continuing policy of doing business and the plaintiffs are entitled to recover for such unlawful practices as occurred within the four years preceding the filing of their complaint. Cardinal Films, Inc. v. Republic Pictures Corp., 148 F.Supp. 156 (S.D.N.Y.1957).[16]

The only violation of the antitrust laws which the plaintiffs have proven relates to the price fixing which took place under the old franchise agreements. The only parties to these agreements who are plaintiffs here are in the Susser, McCoy, Mueller and Frederick cases. The other

14. None of the supplier defendants relies on this defense.

15. See Fleischer v. A. A. P., Inc., 180 F. Supp. 717 (S.D.N.Y.1959).

16. See Momand v. Universal Film Exchanges, 172 F.2d 37, 49 (1st Cir. 1948).

plaintiffs all signed franchise agreements embodying the current Carvel pricing policy which is not in violation of the antitrust laws. The parties to the earlier agreements were not shown to have been notified that Carvel no longer required them to maintain fixed prices until February 27, 1956. Therefore the parties to the old franchise agreements were presumably contractually obligated to maintain prices until February 27, 1956, at which time Carvel formally notified them of its change of policy. The complaints in the Susser, McCoy, Mueller and Frederick cases were all filed within four years of this date and they may therefore recover damages for the periods indicated below:

| Plaintiff | Date of Franchise | Date Action Commenced | Period of Price Fixing for Which Damages May Be Recovered |
|---|---|---|---|
| Susser | 7/17/54 | 9/11/59 | 9/11/55 to 2/27/56 |
| McCoy | 10/30/54 | 10/28/59 | 10/28/55 to 2/27/56 |
| Mueller | 2/24/54 | 9/ 5/58 | 9/ 5/54 to 2/27/56 |
| Frederick | 2/11/53 | 9/ 5/58 | 9/ 5/54 to 2/27/56 |

### IX. *Conclusions.*

1. The action of the plaintiffs against the supplier defendants must be dismissed since the plaintiffs failed to prove that the supplier defendants participated in any illegal conspiratorial boycott against direct sales as alleged or that they engaged in any other violations of the antitrust laws.

2. The plaintiffs failed to show that the requirement imposed by Carvel that the plaintiffs use the supplier defendants' products or products approved by Carvel was an illegal tie-in or a violation of the antitrust laws in any respect.

3. The plaintiffs failed to prove that the restriction against selling other than Carvel approved products on plaintiffs' premises was an illegal form of exclusive dealing or violated the antitrust laws in any respect.

4. The price restrictions imposed by Carvel on the plaintiffs who signed their agreements prior to May 1, 1955 were illegal and the plaintiffs in the Susser, McCoy, Mueller and Frederick cases are entitled to a trial on the issue of damages; all other causes of action of these plaintiffs should be dismissed for failure of proof.

5. The actions of the plaintiffs in the Modick, Ossola, Phelan, Pierce, Rodens, Seu, Pazdro and Giberman cases should be dismissed in their entirety for failure of proof.[17]

### X. *Judgments To Be Entered.*

1. Judgment shall be entered dismissing the actions against the following supplier defendants: Eagle Cone Corporation, H. P. Hood & Sons, Inc., Mohawk Container Company, Inc. and Rakestraw's Dairy Products, Inc.

2. Judgment shall be entered dismissing the actions of the plaintiffs against the individual defendants named in the complaints.

---

17. It may be noted that although franchise agreements of the type involved in this case have seldom figured in antitrust opinions, the general legal conclusions arrived at in this opinion regarding the legality of Carvel's method of conducting its business operations are supported by the recent decision of the United States District Court for the District of Kansas in the case of Engbrecht v. Dairy Queen Company of Mexico, Missouri, 203 F.Supp. 714. That case, which involved franchise agreements closely analagous to those at issue here, held that the provisions in those agreements were not in violation of the antitrust laws. In addition, the court there found that the defendant did not fix the prices at which Dairy Queen products were sold to the public.

3. Judgment shall be entered dismissing the actions of Lester N. Modick and Harriet M. Modick, of James Ossola and Elizabeth G. Ossola, of Joseph P. Phelan, of James P. Pierce and Rita Pierce and Sol Rodens, of Matthew Seu and Jane L. Seu, of Paul S. Giberman and Gertrude Giberman, and of Joseph Pazdro and Yolanda Pazdro.

In accordance with Rule 54(b), 28 U.S.C.A., the Court directs that final judgments may be entered as to all of the causes ot action hereinabove referred to. The Court finds there is no good reason for delay in the entry of such judgments.

Plaintiffs in the Susser, McCoy, Mueller and Frederick cases shall be entitled to a trial on the issue of damages arising out of any restrictions imposed by Carvel on prices to be charged by said plaintiffs for the periods beginning within four years prior to the filing of the complaints and running up to February 27, 1956; such trial to be set at the early convenience of the Court.

Let judgments be entered accordingly.

This opinion shall constitute the findings of fact and conclusions of law of the Court.