■ In the Matter of CARVEL CORPORATION, Respondent-Appellant, v LOUIS J. LEFKOWITZ, as Attorney-General of the State of New York, Appellant-Respondent.—In a proceeding to vacate and quash a subpoena duces tecum issued by the Attorney-General of the State of New York pursuant to section 343 of the General Business Law, the parties cross-appeal from an order of the Supreme Court, Westchester County, entered March 1, 1979, which granted petitioner's application in part and denied it in part. Order affirmed, without costs or disbursements. Thomas Carvel went into the ice cream business in 1934. There are now more than 700 individual Carvel licensees throughout 17 States, including New York, but concentrated primarily in the northeast and Florida. There are approximately 400 outlets in the State of New York. Petitioner's corporate headquarters is located in Yonkers, New York. The Carvel method of doing business was thoroughly scrutinized in the Federal court system and before the Federal Trade Commission, and in each case held not to violate the antitrust laws* *(Susser v Carvel Corp.,* 206 F Supp 636, affd 332 F2d 505, cert granted 379 US 885, cert dsmd as improvidently granted 381 US 125; *Carvel Corp.* [1965-1967 Transfer Binder], Trade Reg Rep, par 17, 298, pp 22,422-22,425 [FTC, 1965]). In July, 1978 the State Attorney-General served upon Carvel a nonjudicial subpoena duces tecum demanding that Carvel "appear" and: "bring with you, or otherwise produce or deliver to the Attorney General, a statement in writing under oath, by way of answers in writing under oath to each of the interrogatories propounded in the Attachment hereto, which the Attorney General deems relevant and material to *an inquiry in regard to matters relating to the practices of Carvel Corporation and associated suppliers of dairy and non-dairy products and others in unlawfully establishing or maintaining a monopoly, or in free exercise of any activity,* in the conduct of any business, trade or commerce or in the furnishing of any service in this State in violation of Article 22 of the General Business Law and particularly § 340 thereof, with respect to the following: *maintenance of*

---

* Except that price restrictions imposed by Carvel on the plaintiffs who signed their agreements *prior* to May 1, 1955 were held to be illegal *(Susser v Carvel Corp.,* 206 F Supp 636, 652).

*tying or exclusive dealing arrangements and other restraints of trade and competition, and ancillary practices in furtherance thereof.* WE FURTHER COMMAND YOU, pursuant to General Business Law § 343, that all business and excuses being laid aside, you produce for inspection and copying, or otherwise deliver to the Attorney General, at the time and place stated or at any adjourned time and place thereof, all documents in your possession, custody or control that are identified by you in your answers to the interrogatories propounded in the Attachment hereto, which the Attorney General deems relevant and material to the above stated inquiry." (Emphasis supplied.) The subpoena consists of 39 pages and contains 99 numbered items, a multitude of subdivisions and more than a score of "Definitions." It takes in all 17 States in which petitioner operates. It states that "Unless otherwise specified in a particular paragraph, the period covered by this subpoena shall be from January 1, 1970 to the date of this subpoena." Petitioner moved to quash the subpoena in its entirety. The Attorney-General opposed. Massive affidavits, documentation and memoranda of law were submitted to Special Term by both parties. The moving affidavit of James A. Douglas, a vice-president of the petitioner corporation, averred: "2. In summary fashion, Carvel's objections to the subpoena are that it is oppressively broad, harrassing *[sic]* and vague in nature. This can be illustrated by the fact that compliance with the subpoena would probably cost Carvel in excess of a quarter of a million dollars ($250,000), would require the expenditure of literally thousands of man hours; and would require the production of virtually all of Carvel's records for the past eight and a half years, thereby seriously impeding the operation of the business. People would have to be switched from regular assignments to undertake the task of compliance with the subpoena. After careful study I estimate that the documents called for would fill 1,795 five-foot-long transfiles. Nine large trucks would be required merely to transport the material. * * * The breadth of the subpoena is such that permitting its demands to be met permits an arbitrary and unbridled desecration and ransacking of Carvel's files. It is Carvel's belief after careful review that this subpoena really involves a roving, indiscriminate search through all documents for the purpose of generally prying into the affairs of Carvel. That is particularly so in view of the fact that secret and special formulas are sought belonging to Carvel which are of incalculable value even though the exact nature of the secret formula is not relevant. Carvel has never before been required to produce these formulas, with proof of their secrecy having always previously sufficed. * * * 35: Again, with respect to Demand '8' that requires listing and examination of literally tens of thousands of documents over a five-year period. Voluminous documents located outside the State of New York and not having any relationship to operations within the State of New York have to be reviewed and listed. Let me illustrate. Carvel receives or sends approximately 10,000 writings a week relating to the 'transactions and communications with dealers and suppliers' which would fall within the ambit of Demand '8'. That amounts to 520,000 documents a year. Multiplying that in turn by the period of time involved, and the documents required are more than 2,000,000 documents in number. An idea of the burdensom *[sic]* nature of the subpoena is indicated by the fact that each of these documents is then required to be 'identified' by Carvel in writing according to the instructions of the subpoena as to type (i.e., letter, memorandum, telegram, chart, etc.) date, author, addressee, title, file and identifying number and symbol with present location and custodian. Assuming that 20 entries could be listed on a page, it would require 100,000 pages merely to

list Carvel's answers to Demand '8' with the specificity required by Respondent's instructions." The Attorney-General submitted extensive affidavits and documentation in support of the subpoena and purporting to demonstrate that the subpoena was issued pursuant to a lawful bona fide investigation of various alleged violations of the antitrust laws and of the civil rights of Carvel licensees. The moving and opposing affidavits refer to premotion conferences to limit the scope of the subpoena. The Attorney-General's papers assert that petitioner sought to use the conferences, *inter alia,* to ascertain the names of licensees who may have complained to the Attorney-General. In his reply affidavit, however, petitioner's vice-president averred: "The fact is that throughout these five proceedings our attorneys told respondent that respondent was being 'used' by a very few dealers who were attempting to threaten and blackjack Carvel, in an attempt to force Carvel to let them operate their stores as totally independent stores under the Carvel name, in total disregard of the contractual commitments those dealers had made to Carvel, to other Carvel dealers, and to the consuming public accustomed to buying the Carvel product under the Carvel name." Special Term set forth a general review of pertinent authorities and then disposed of petitioner's motion as follows: "In the instant case, the production of documents embodied in 99 detailed demands, covering a period of 8-½ years, spanning a territory of 16 *[sic]* states and requiring an expenditure of $250,000 is obviously sweeping in nature and unduly burdensome. An investigation into transactions in 15 *[sic]* other states is patently irrelevant to the avowed purpose of Article 22 of the General Business Law to protect the rights of the residents of New York State. An investigation which reaches back 8-½ years when there is a statute of limitations of 4 years for civil violations and three years for criminal violations seeks information unrelated to any matter properly under inquiry and exceeds the investigatory power. * * * The scope of the subpoena must therefore be limited to a period of four years for civil violations and three years for criminal acts. Only transactions in the State of New York may be investigated and items 11(g), 21, 29, 30, 31, 33, 37, 38, 39, 40, 41(a) and (b), 51, 61, 62, 63, 68(b) 69, 70 and 71 as they relate to demand 62 and item 98 are stricken from the subpoena as not sufficiently related to the purpose of the investigation. * * * Carvel Corporation will not be required to surrender its secret formula." We have examined the subpoena, the voluminous affidavits, exhibits and memoranda of law submitted at Special Term and the briefs on appeal. We conclude that Special Term's reasoning, citations of authority and disposition of the motion were correct and just, and that the order under review should be affirmed. The Attorney-General's authority under article 22 of the General Business Law to conduct an investigation into possible violations of law committed in this State was clearly established. However, the geographic scope and time span of the subpoena, its length, its many subdivisions and its sweeping definitions and probes made it—unless modified—an instrument for oppression and official administrative ransacking of virtually all of petitioner's files and papers for its operations in 17 States over an eight and one-half year time span, with petitioner's secret formula thrown in to boot. It may be wondered how petitioner—without actually compiling all of the data called for by subpoena—could state with mathematical precision the logistics that would be involved in assembling the data requested. However, our examination of the subpoena and the many other pages in the record convinces us that petitioner's averments as to the oppressive nature of the subpoena are reflective of reality and not mere hyperbole. The burdensome nature and scope of the subpoena fully

justified the modifications made by Special Term (see *Segan v Dreyfus Corp.,* 513 F2d 695, 696 [affirming the denial of discovery "of virtually the entire business history of defendants for a period of several years"]; *Matter of Grand Jury Investigation [General Motors Corp.],* 174 F Supp 393, 395 [quashing a subpoena calling for production of "practically every paper outside of routine correspondence relating to every phase of the corporation's affairs"]; cf. *Matter of Crowley Foods v Lefkowitz,* 75 AD2d 940). The geographic and time limitations imposed by Special Term need not of course be applied as a matter of law in all cases (see *Matter of Crowley Foods v Lefkowitz, supra),* but the vast scope and nature of the subpoena in the case at bar fully justified the modifications made by Special Term. The *Susser* and FTC decisions *(supra),* while entitled to considerable weight, could not indefinitely immunize petitioner's future practices or clothe petitioner with permanent immunity from State investigation more than 13 years after those decisions. Thus, the unmodified portions of the subpoena must be upheld. This court finds no ground for further modification and no basis to quash this subpoena in its entirety (cf. *Matter of Crowley Foods v Lefkowitz, supra).* We note that petitioner's brief to this court argued that "in any event by reason of respondents' *[sic]* commencing his civil action by service of summons and complaint verified August 9, 1979 against Carvel and others which complaint covers the same ground as the stated purpose of the investigative subpoena, said investigative subpoena must be deemed moot or an improper substitute for pre-trial discovery in the respondent's newly brought civil action." Petitioner buttressed this argument with a postargument affidavit filed with this court in March, 1980, averring that: "On March 17, 1980 respondent mailed both interrogatories and a notice for discovery and inspection of documents addressed to Carvel in the civil action pending between the parties. A copy of said interrogatories is annexed as Exhibit '1'; a copy of the notice for discovery and inspection of documents is annexed as Exhibit '2'. The demands of the interrogatories and the notice of inspection now served by Respondent in the pending civil action, and the demands of the investigative subpoena are virtually identical with one another as is made clear by simple examination of the three documents. * * * It is submitted that the latest development which occurred in the past week demonstrates conclusively that the so-called investigative subpoena was in fact being pressed as an improper substitute for pre-trial discovery in a pending civil action between the parties, as Carvel contended." This court notes that the civil suit and the proceedings therein postdate the order under review and are not part of the record on this appeal. Were those proceedings part of the record herein, however, we would find no merit to petitioner's argument (see *State of New York v Mobil Oil Corp.,* 40 AD2d 369, affd 33 NY2d 627; *People v Anaconda Wire & Cable Co.,* 19 AD2d 867; *Long Is. Moving & Stor. Assn. v Lefkowitz,* 24 AD2d 452, mot for lv to app den 17 NY2d 419, app dsmd 17 NY2d 918; *Matter of Crowley Foods v Lefkowitz, supra).* Titone, J. P., Gibbons, Cohalan and Martuscello, JJ., concur.