OPINION OF THE COURT
Joseph Harris, J.
The instant case involves the perpetual clash between the *166 legislative process, the constitutional rights of free speech, association and privacy of individuals, and the power of the judiciary as the arbiter between the two.
THE FACTS
Shortly after the last gubernatorial election in November 1994, in which the incumbent party was defeated and George E. Pataki was elected Governor, supporters of the incoming Governor created two "for profit” corporations known as New York Inaugural ’95, Inc. (Inaugural ’95) and New York Transition ’95, Inc. (Transition ’95), these entities intended to serve as management entities for Governor Pataki’s inaugural events and transition period, respectively. The object of the former was to open the inaugural events to the general public without an undue invasion of the public fisc, and of the latter to provide for an orderly transition of executive powers. These corporations — necessary and proper in their purpose — were neither subject to the State political contribution and reporting laws, nor charitable registration requirements, nor has there been presented any evidence of criminality in their formation and procedures.[1] All taxes that had to be paid were paid and all laws that had to be complied with were in fact complied with. *167 Thus neither of the two corporations are in violation of any current law, although it remains to be determined whether examination of the two corporations is reasonably necessary for future legislation that may be considered by the Legislature.
Receiving no voluntary response to a request for production of books and records, on February 27, 1996, subpoenas were served upon petitioners by respondents (three chairmen of standing committees of the New York State Assembly), returnable March 20, 1996, requiring the production of all of the records of the two corporations (indeed, seemingly every scrap of paper), and other oral testimony.
In their subpoenas respondents, pursuant to the mandate of section 73 (2) of the Civil Rights Law, set forth a copy of section 73 (2) and a "general statement of the subject of the investigation.”[2]
THE LAW
The "General Statement of the Subject of the Inquiry and Investigation” as set forth in the subpoenas recites: "This is to advise you, pursuant to Section 73 (2) of the Civil Rights Law, *168 that the subjects of the inquiry and investigation being conducted by the New York State Assembly Committees on Governmental Operations, Election Law and Oversight, Analysis and Investigation are: the activities of New York Inaugural ’95 Inc., and New York Transition ’95 Inc. and whether existing election, ethics and related laws and regulations relating to the activities of corporations such as these are adequate to protect the public interest.”
Although section 73 (2) calls for a "general” statement of the subject of the investigation, considering the nature of this case, in which there is no evidence of the violation of any current law, but the contrary, the statement of the subject of the inquiry in the instant subpoenas is as skimpy as one can get without being in essence no statement at all. If such a statement is sufficient here, no corporation or individual would be immune from the whim of a legislative committee, thus destroying the rights of association and of privacy guaranteed by the United States Constitution and the Constitution of the State of New York. Such a skimpy statement, if sufficient, does nothing to curb the excesses of governmental subpoenas for which section 73 (2) of the Civil Rights Law was enacted in 1954. Venal motives are not to be lightly attributed to the actions of a legislative committee, nor must a legislative committee ignore the political impact of an inaugural committee and transition committee such as are involved here, but such impact must be weighed against the associational rights and rights of privacy of the persons involved in these two legitimate activities. Inattention to these latter two considerations might well exert a chilling effect on political contributions and unduly interfere with the executive branch of government (especially by interfering with the activities of the transition committee) trying to organize itself after a political victory at the polls by the party heretofore out of power, thus thwarting the will of the People.[3]
In Watkins v United States (354 US 178, 187, 198-199, 205, 215-216), the Supreme Court of the United States wrote:
"The power of the Congress to conduct investigations is inherent in the legislative process. That power is broad. It en *169 compasses inquiries concerning the administration of existing laws as well as proposed or possibly needed statutes. It includes surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them. It comprehends probes into departments of the Federal Government to expose corruption, inefficiency or waste. But, broad as is this power of inquiry, it is not unlimited. There is no general authority to expose the private affairs of individuals without justification in terms of the functions of the Congress * * * No inquiry is an end in itself; it must be related to, and in furtherance of, a legitimate task of the Congress. Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish’ those investigated are indefensible * * *
"We cannot simply assume, however, that every congressional investigation is justified by a public need that overbalances any private rights affected. To do so would be to abdicate the responsibility placed by the Constitution upon the judiciary to insure that the Congress does not unjustifiably encroach upon an individual’s right to privacy nor abridge his liberty of speech, press, religion or assembly * * *
"It is, of course, not the function of this Court to prescribe rigid rules for the Congress to follow in drafting resolutions establishing investigating committees. That is a matter peculiarly within the realm of the legislature, and its decisions will be accepted by the courts up to the point where their own duty to enforce the constitutionally protected rights of individuals is affected * * *
"We are mindful of the complexities of modern government and the ample scope that must be left to the Congress as the sole constitutional depository of legislative power. Equally mindful are we of the indispensable function, in the exercise of that power, of congressional investigations. The conclusions we have reached in this case will not prevent the Congress, through its committees, from obtaining any information it needs for the proper fulfillment of its role in our scheme of government. The legislature is free to determine the kinds of data that should be collected. It is only those investigations that are conducted by use of compulsory process that give rise to a need to protect the rights of individuals against illegal encroachment. That protection can be readily achieved through procedures which prevent the separation of power from responsibility and which provide the constitutional requisites of fairness for witnesses. A measure of added care on the part *170 of the House and the Senate in authorizing the use of compulsory process and by their committees in exercising that power would suffice. That is a small price to pay if it serves to uphold the principles of limited, constitutional government without constricting the power of the Congress to inform itself.”
These are the parameters of due process required for the issuance of a nonjudicial subpoena by a government agency or legislative committee.
OVERBROADNESS
The subpoenas require production of every shred of paper imaginable, and beyond, whether related to the names of contributors and the amounts of their contributions, and for what and in what amounts the money was used, which under the respondents’ professed purpose for the subpoenas, and the circumstances of this case (no evidence of any violations of current law being manifest herein), is the only area of legitimate inquiry. To hold otherwise would be to completely divest the corporations and the participants therein of their constitutional rights of association and right to privacy.
In analyzing the legitimate breadth of a government subpoena a court must separate the relevant from the irrelevant and properly balance the interests of the Legislature with the associational rights and right to privacy of the persons summoned. There is no authority under our form of government for Legislatures and legislative committees to unnecessarily rove untrammelled through the private lives of the citizenry, whether individual or corporate.
SUMMARY OF REQUIREMENTS FOR ISSUANCE OF A SUBPOENA BY A GOVERNMENTAL AGENCY AND LEGISLATIVE COMMITTEE
In Matter of Crowley Foods v Lefkowitz (75 AD2d 940, 941) the Appellate Division, Third Department, held: "An agency issuing a nonjudicial subpoena must show its authority, the relevancy of the items sought and some factual basis for inquisitorial action (Myerson v Lentini Bros. Moving & Stor. Co., 33 NY2d 250)” (see also, Matter of Pharmaceutical Socy. v Abrams, 132 AD2d 129 [3d Dept 1987]; Matter of A’Hearn v Committee on Unlawful Practice of Law of N. Y. County Lawyers’ Assn., 23 NY2d 916).
In Myerson (supra, at 256), the Court of Appeals stated:
"It is settled in this State that there are limits upon the power of public officials authorized to issue subpoenas. In the *171 leading case of Carlisle v. Bennett (268 N. Y. 212, 217-218) it was stated that the power of the Attorney-General in investigating alleged securities fraud, is necessarily limited to a 'proper case’, 'one where the books and papers * * * have some relevancy and materiality to the matter under investigation [citations omitted].’ The court further stated that the statutory authorization to issue subpoenas would not be construed to allow the Attorney-General to embark upon a roving course to pry into the affairs of any person.
"It has been repeatedly stated that a witness subject to a 'nonjudicial’ subpoena duces tecum may always challenge the subpoena in court on the ground it calls for irrelevant or immaterial documents or subjects the witness to harassment [citations omitted]. And the public official seeking court enforcement of the nonjudicial subpoena must show the records bear a reasonable relation to the subject matter under investigation and the public purpose to be served (Matter of La Belle Creole Int., S. A. v. Attorney-General of State of N. Y., 10 N Y 2d 192, 196).” This, for the most part, respondents have failed to do.
Citing A ’Hearn (supra), the Court of Appeals further stated that, "especially in issuing a subpoena duces tecum: '[N]o agency of government may conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered’ ” (Myerson v Lentini Bros. Moving & Stor. Co., supra, at 256; see, A’Hearn v Committee on Unlawful Practice of Law of N. Y. County Lawyers’ Assn., supra, 23 NY2d, at 918).
A consideration in the instant case not present in the above-cited cases is that involved herein are the prerogatives of the Legislature and legislative committees to investigate not for the uncovering of wrongdoing respecting current law but for the purpose of determining the necessity for new laws. This is a consideration of a higher order than those involving mere executive governmental agencies engaged in the task of uncovering wrongdoing under current law. Nevertheless legislative committees are also bound by the principles stated above — a showing of authority, relevancy of the matters sought to the purpose of the inquiry, and some factual basis for the inquiry. In the instant case there is absolutely no evidence of wrongdoing to be uncovered, and it would appear that the legitimate purpose of the respondents’ inquiry may be fully satisfied by the petitioners furnishing respondents the names of contributors, the respective amounts contributed, and where and for *172 what such contributions were spent, without the necessity for further documents and, for the present at least, oral testimony. To hold otherwise would be to condone a fishing expedition by respondents into the personal affairs of the citizenry.
[Omitted from the published opinion for spatial considerations is the court’s discussion of Civil Rights Law § 73 (2), which is based on an application of Matter of Pharmaceutical Socy. v Abrams (132 AD2d 129).]
CONCLUSION
The ultimate issue herein is whether or not the subpoenas and the documents and testimony sought are overbroad, a question the court has already decided in the affirmative.
For all of the reasons above stated, the court holds the subpoenas involved herein overbroad except as to the request for the names of the contributors to the inaugural and transition corporations, the amounts of their contributions, and where, to whom and for what such moneys were spent. To that extent the subpoenas are valid; beyond that they are not. This decision fairly balances the legitimate functions of the Legislature with the associational and privacy rights of petitioners. It allows the Legislature to fulfill its proper role without permitting an unnecessary political feeding frenzy.
That information is to be supplied by petitioners to respondents within 40 days from service of the order entered herein; once this is done, and beyond that extent, the subpoenas, including all other documents and oral testimony, are quashed, except that this court will retain jurisdiction for the purpose of determining whether compliance by petitioners with the order entered herein reasonably satisfies the legitimate purposes of respondents or whether or not modification of the order is necessary.

. See letter of Dennis C. Vacco, Attorney-General, to Senator Richard Dollinger, dated December 29,1995, attached as exhibit K to affidavit of Jennifer Cunningham, and the opinions contained therein. See also 1994 Opinion of Counsel to State Board of Elections, unanimously approved by the Commissioners of the State Board of Elections (exhibit K) stating: "the creation of a committee to fund the inauguration of the governor-elect is not a political committee. Any money given to that committee would not be money given to a political committee.” The Opinion concluded that, "[s]ince the inaugural committee is not a political committee, and the money given to the inaugural committee is not a contribution as defined by the New York State election law, the contribution limits and reporting requirements of the New York State election law do not apply to money given to this inaugural committee.” Hence, the contribution limitations and the periodic filings addressed in article 14 of the Election Law are inapplicable to the activities of the inaugural and transition corporations.
Article 14 of the Election Law governs campaign receipts and expenditures and campaign finance requirements. Section 14-100 (1) expressly defines a corporation subject to filing and reporting requirements as a "corporation aiding or promoting * * * the success or defeat of a political party or principle, or of any ballot proposal; or to aid or take part in the election or defeat of a candidate for public office”.
In the opinion of the Attorney-General "[t]he requirements of Article 14 [of the Election Law] are not applicable to the business corporations you question. Neither Inaugural nor Transition was involved in aiding or promoting the election or defeat of a candidate for public office or the success or *167 defeat of a political party or principle or of any ballot proposal, and thus neither was a 'political committee’ governed by section 14-100 (1) of the Election Law. Since the corporations were created to fund, respectively, inaugural expenses and the expenses of transition, any funds given to these corporations were not contributions to political committees. The definition of 'contribution’ in section 14-100 (9) of the Election Law does not encompass monies received for inaugural or transition expenses.”
In summary, both the Attorney-General and the New York State Board of Elections conclude, in the language of the Attorney-General: "As defined by the Election Law, the two corporations created to fund inaugural and transition expenses were not political committees and the monies received were not political contributions. The provisions of Article 14 of the Election Law, therefore, did not govern monies given by corporations or individuals to either the Inaugural or Transition corporation. There is no public disclosure requirement in the Election Law which pertains to these corporate activities.” These arguments are persuasive on the issues to which they relate— namely, that the two corporations (inaugural and transition) are not "political committees” and are not subject to the current Election Law. Neither are they subject to article 7-A of the Executive Law, entitled "Solicitation and Collection of Funds for Charitable Purposes”, and the registration requirements contained therein. (See, letter of Atty Gen and Opn Counsel St Bd of Elections, supra).

. Section 73 (2) of the Civil Rights Law, enacted in 1954 to curb the excesses of governmental subpoenas, recites as follows: "No person may be required to appear at a hearing or to testify at a hearing unless there has been personally served upon him prior to the time when he is required to appear, a copy of this section, and a general statement of the subject of the investigation. A copy of the resolution, statute, order or other provision of law authorizing the investigation shall be furnished by the agency upon request therefor by the person summoned.”

. When government designs to invade the associational rights and rights to privacy of adherents to one political party, there commences at the same time an erosion of these rights with respect to adherents of other political parties. Thus, if respondents can properly engage, without curbs, in the inquiries sought to be engaged herein, there is nothing to prevent the Senate from doing the same thing with respect to the adherents of the political party formerly in power. To what end respecting the political process?