[891 NYS2d 590]

In the Matter of RICHARD BRODSKY, Chairman of the New York State Assembly Committee on Corporations, Authorities and Commissions, et al., Petitioners, v THE NEW YORK YANKEES et al., Respondents.

Supreme Court, Albany County, July 29, 2009

## APPEARANCES OF COUNSEL

*Richard L. Brodsky*, Albany, petitioner pro se, and for James Brennan, petitioner. *Boies, Schiller & Flexner LLP*, Albany (*George F. Carpinello* of counsel), for respondents.

## OPINION OF THE COURT

JOHN C. EGAN, JR., J.

The word "subpoena" is Latin for "under penalty."[1] It is an order of a court, Legislature or a grand jury compelling a witness to be present at a trial or hearing under penalty of fine or imprisonment.

Petitioners, Richard Brodsky and James Brennan (petitioners), commenced this action by order to show cause, dated April 22, 2009, seeking to compel the respondents, the New York Yankees and Randy Levine, to comply with a legislative subpoena issued by them on January 12, 2009.[2] Respondents oppose the proceeding and cross-move seeking an order (1) to quash the January 12, 2009 legislative subpoena, and (2) to modify the April 22, 2009 order to show cause to rescind that portion that directs the respondents to produce a catalog of documents at the return date of the hearing of this proceeding. Petitioners oppose the respondents' cross motion. A hearing was conducted on June 1, 2009.[3]

The relevant facts are as follows:

---

1. The American Heritage New Dictionary of Cultural Literacy (Houghton Mifflin Company 3d ed 2005), available at http://dictionary.reference.com/browse/subpoena (accessed July 21, 2009).

2. The April 22, 2009 order to show cause ordered that respondents produce for inspection by the court "a catalog of documents and materials now or formerly in possession of the New York Yankees regarding the materials set forth in the Subpoena, including any claimed privilege or defenses to the required production of any particular document."

3. By order to show cause dated May 21, 2009, respondents sought an order quashing a subpoena served on Randy Levine on May 20, 2009 commanding that he appear and testify at the hearing on this matter, and also to compel petitioners to comply with a subpoena for certain documents and records served on May 11, 2009. At the June 1, 2009 hearing of this matter, respondents' order to show cause dated May 21, 2009 was denied, insofar as it sought an order quashing a subpoena served on Randy Levine on May 20, 2009.

Petitioner, Richard Brodsky, is a duly elected member of the New York State Assembly and also the Chairperson of the Assembly Standing Committee on Corporations, Authorities and Commissions (Corporations Committee). According to petitioner Brodsky, the Corporations Committee "considers and acts on legislation referred to it, regularly holds legislative hearings, conducts investigations, and issues reports." Petitioner James Brennan is also a duly elected member of the New York State Assembly and the Chairperson of the Assembly Standing Committee on Cities (Committee on Cities). According to petitioner Brodsky, the Committee on Cities "considers and acts on legislation, conducts investigations, and regularly holds committee meetings and hearings."

In June 2008, the Corporations Committee and the Committee on Cities commenced an investigation into the circumstances surrounding the public financing of the new Yankee Stadium and Citi Field used by the New York Mets. By correspondence dated June 26, 2008, the petitioners advised the respondent Randy Levine, the president of the New York Yankees, that a public hearing would be held regarding the financing of the new Yankee Stadium, and that Mr. Levine was welcome to appear and testify. On July 2, 2008, the Corporations Committee and the Committee on Local Government held such a hearing.[4] As a result of the July 2, 2008 hearing, by correspondence dated July 28, 2008 petitioners posed "Questions For The New York Yankees."[5]

On January 8, 2009, petitioners requested that Mr. Levine appear and present testimony at a public hearing scheduled to commence on January 14, 2009. On January 10, 2009, Mr. Levine advised that he would not appear at the January 14, 2009 hearing.

---

**4.** A representative from the New York City Industrial Development Agency (NYCIDA), Seth Pinsky, testified at the July 2, 2008 hearing. Mr. Pinsky testified, in part, that "[t]he IDA's purpose generally is to encourage economic development and create, attract, and retain jobs throughout New York City. The IDA achieves this by making targeted, discretionary investments in private sector projects that are consistent with its mission."

**5.** Among the questions posed included information regarding the Yankees' continued presence in New York City; the assessment of the new Yankee Stadium; whether the Yankees were "planning to amend the estimates of new permanent jobs, and other non-permanent jobs, that were included in the previous and new IDA applications"; information regarding ticket revenue (including "[w]hat will the Yankees do to assure access to games for people of all economic levels"); and information regarding the "Community Benefit Agreement."

On January 12, 2009, petitioner Brodsky introduced 2009 NY Assembly Bill A1874, entitled "AN ACT to amend the public authorities law, the not-for-profit corporation law and the general municipal law, in relation to borrowing by public authorities, not-for-profit corporations, and industrial development agencies." The stated purpose of Assembly Bill A1874 is to "ensure that projects that receive tax payer funding provide a true public benefit; including job growth and capital investments." (Assembly Mem in Support of 2009 NY Assembly Bill A1874.) The stated summary of Assembly Bill A1874 is an amendment of the Public Authorities Law, the Not-For-Profit Corporation Law, and the General Municipal Law by adding a section that would prohibit any public authority, not-for-profit and industrial development agency in the State of New York or any officer thereof from taking any action regarding the authorization, approval, issuance or facilitation of the issuance, marketing, sale or approval of any bond or borrowing exceeding $50 million dollars unless it could be shown that (a) the projected job creation and/or the investment in the proposed location verses the total number of benefits the business enterprise receives shall be a ratio of at least 20:1, and (b) the cost of creation of permanent new jobs is less than $50,000.[6]

As justification for Assembly Bill A1874, the Committee states that "[w]ithout a measurable, identifiable, specific and significant public benefit, public financial assistance should not be given. This bill will protect public funds and ensure that a true public benefit will be achieved when large economic development projects are subsidized by New Yorkers."

By document dated January 12, 2009, the Corporations Committee and the Committee on Cities served Randy Levine, as president of the New York Yankees, with a subpoena and subpoena duces tecum, made returnable on January 14, 2009, seeking the following:

1. Any and all documents and materials relating to the issuance of approximately $950 million of indebtedness by the New York City Industrial Development Agency including documents and materials relating to the negotiations and approvals of such financing;

2. Any and all documents and material pertaining to the negotiation for and/or receipts and expenditures by any public agency for the new Yankee Stadium or any infrastructure related or appurtenant thereto;

---

6. Affidavit of Richard L. Brodsky, sworn to on Apr. 22, 2008, ¶ 14.

3. Any and all documents and materials relating to any and all tax abatements, deferrals or other tax benefits provided to or authorized by any public body relating or pertaining to the construction and operation of the new Yankee Stadium or any infrastructure related or appurtenant thereto;

4. Any and all documents and materials related to the NY-CIDA financing for Yankee Stadium currently scheduled for a final vote on January 16, 2009, including, but not limited to, preliminary and final applications, all correspondence (electronic or hard copy) related to the negotiations over this additional funding, and all such correspondence related to government inquiries and activities about such financing up to and including January 12, 2009, and any changes, proposed or final, in the uniform tax-exemption policy of the NYCIDA from 2005 to today.[7]

Attached to the January 12, 2009 subpoena is a document entitled "GENERAL STATEMENT OF THE SUBJECT OF THE INQUIRY AND INVESTIGATION," which provides as follows:

> "This is to advise you that the New York State Assembly Standing Committee on Corporations, Authorities and Commissions and the New York State Assembly Standing Committee on Cities pursuant to Section 60 [of] the Legislative Law, and pursuant to Paragraph [c] of section 1 of the Rule IV of the Rules of the Assembly, is holding a hearing concerning the need for legislation to bring increased accountability, transparency, efficiency, and fiscal reliability to the activities of and the borrow-

---

7. In their application to this court, petitioners assert that "initial review of information about public subsidies of Yankee Stadium and Citifield revealed a number of areas of significant concern, especially with respect to Yankee Stadium. These include the total value of the public subsidy of Yankee Stadium, approaching $4 billion, at a time when fundamental public obligations such as schools, hospitals and mass transit go unfunded; very few permanent new jobs or private sector investment as a result of the public subsidy; ticket prices at Yankee Stadium well beyond the reach of average taxpayers; illegal manipulation of property tax assessments; special privileges including luxury box tickets given to elected officials; manipulation of state laws requiring public benefits for public subsidies[,] including a 'deviation letter' exempting the Yankees from normal requirements; the use of conflicting appraisals for parkland taken by the Yankees; misleading and untrue statements by officials as to the status of the project; and other issues."

ings by authorities, municipal governments, and other public entities, including local development corporations and industrial development agencies within the state of New York. The inquiry and hearings will develop information, *inter alia* about the operations of the New York City Industrial Development Agency, the Empire State Development Corporation, the City of New York, and other public entit[ies], including but not limited to the issuance of public debt for the construction, reconstruction or operation of the new Yankees Stadium located in the Bronx, which may require oversight and change addressed in the legislation currently before the New York State Assembly Standing Committees on Corporations, Authorities and Commissions, and/or Cities, including, but not limited to, Assembly Bill No. A. 1874.''

Mr. Levine appeared at the January 14, 2009 hearing, but produced no documents.[8] Between January 15, 2009 and February 27, 2009, the parties communicated back and forth regarding compliance with the subpoena and the narrowing of the document requests.

Petitioners scheduled a third hearing to commence on March 6, 2009. Mr. Levine appeared at the March 6, 2009 hearing and produced documents, in ''partial compliance'' with the January 12, 2009 subpoena.[9] Thereafter the parties again communicated back and forth regarding narrowing the document demands set forth in the subpoena.[10] By correspondence dated April 3, 2009, the petitioners requested compliance with the subpoena. By correspondence dated April 10, 2009, respondents advised that their good faith efforts to respond to the subpoena ''are already on the public record,'' and that ''at every turn, [petitioners] have either expanded or radically changed the scope of the docu-

---

**8.** Respondents submit that ''due to the brevity of time for review, Mr. Levine would not produce documents at the January 14 hearing.'' Following the January 14, 2009 hearing, respondents allege that petitioner Brodsky told a Fox Business televison reporter that he ''got the information [he] wanted.''

**9.** Respondents produced 410 pages of documents on CD-ROM for the convenience of the Committees. At the March 6, 2009 hearing, respondents' attorney (Jonathan D. Schiller, Esq.) testified that it was respondents' position that petitioners look to the City of New York for the documents requested. Mr. Schiller voiced his concerns about the scope of the subpoena, and asserted that the production of documents was subject to objections previously made.

**10.** Respondents assert that, instead of narrowing the scope of the subpoena, petitioner Brodsky instead presented respondents with new requests for documents.

ments you say you are seeking from the Yankees." On April 14, 2009, the respondents forwarded the petitioners a CD-ROM of additional documents.[11] Based on what the petitioners deem is the respondents' refusal to produce subpoenaed documents in violation of their legal obligation, petitioners commenced this proceeding.

In support of the order to show cause, petitioners argue that the subpoenaed documents are material to and within the scope of the Committees' ongoing investigation.[12] Petitioners assert that their inquiry is also relevant to the Legislature's consideration of "numerous bills referred to the Committee, including, but not limited to, Assembly Bills A. 1874, A. 508[13] and A. 7659."[14] Petitioners assert that Legislative Law § 62-a provides

---

**11.** Petitioners assert that most of these documents were already in their possession.

**12.** In support of their application to this court, petitioners assert that the documents subpoenaed are material to:

> "[whether the Yankees] knew of, caused, or participated in the illegal manipulation of property tax assessments; how many permanent or temporary new jobs are created and what wages are being paid; whether Yankee ticket prices have the effect of excluding the vast majority of New Yorkers from access to a Stadium built with taxpayer money; how much the public was charged for free luxury tickets for public officials; whether City and State taxpayers were illegally deprived of tax revenues needed for other public purposes; the reason for delay in required parkland replacement, and many others."

**13.** 2009 NY Assembly Bill A508 was introduced and referred to the Corporations Committee on January 7, 2009, and is "AN ACT to amend the public authorities law, in relation to enacting the 'public benefits for professional facilities act.' " Assembly Bill A508 would amend the Public Authorities Law by adding a new title that would require the Empire State Development Corporation to provide to the Legislature an accounting of all benefits that any state or local authority has granted, and to condition any such benefit on an affordable ticket agreement. The purpose of Assembly Bill A508 is to "provide an accounting of all benefits that any state or local authority has granted for the purpose of construction, reconstruction, repair, or rehabilitation of a professional sports facility to the legislature, and to condition such benefits on an affordable ticket agreement." (Assembly Mem in Support of 2009 NY Assembly Bill A508.)

**14.** NY Assembly Bill A7659 was introduced by petitioner Brodsky and referred to the Corporations Committee on April 17, 2009, after the issuance of the subpoena which forms the basis of petitioners' present application. Assembly Bill A7659 "amends the Public Authorities Law by adding a new section 2927 and provides that no governmental entity may grant financial or economic benefits to any private entity without first publishing a detailed list of all public benefits to be returned by these investments." As Assembly Bill A7659 was referred to the Corporations Committee well after the date the

the Committees' chairs with the authority to issue the January 12, 2009 subpoena.[15]

In opposition to the petitioners' order to show cause and in support of their cross motion, respondents assert that (1) petitioners are acting without the appropriate legislative authority required by Civil Rights Law § 73 (2),[16] (2) the subpoena has not been issued in furtherance of any legitimate legislative function,[17] (3) the subpoena is overbroad and unduly burdensome as the information sought is likely within the possession of the public authorities (such as the NYCIDA) and because it would require the Yankees to search the paper and electronic files of up to 100 separate custodians,[18] (4) respondents have attempted,

---

subpoena was issued, it cannot be used to justify the scope of the documents sought in the subpoena.

**15.** Legislative Law § 62-a provides that

"[t]he chairman, vice-chairman or a majority of a legislative committee may issue a subpoena requiring a person to attend before the committee and be examined in reference to any matter within the scope of the inquiry or investigation being conducted by the committee, and, in a proper case, to bring with him, a book or paper. The provisions of the civil practice law and rules in relation to enforcing obedience to a subpoena lawfully issued by a judge, arbitrator, referee or other person in a matter not arising in an action in a court of record apply to a subpoena issued by a legislative committee as authorized by this section. Any member of a legislative committee may administer an oath to a witness."

**16.** Respondents cite to *Matter of Costiglio v Strelzin* (98 Misc 2d 548 [Sup Ct, NY County 1978]). Respondents also submit the affidavits of Carmen E. Arroyo and Carl E. Heastie, both members of the New York State Assembly. Assemblywoman Arroyo testifies, in part, that petitioners' activities do not have specific approval from the New York Assembly. Assemblyman Heastie testifies, in part, that "[a]s a member of the committee," he believes that the Yankees have cooperated extensively and sufficiently with "this committee's inquiry." Assemblyman Heastie does not identify on which committee he sits.

**17.** Respondents assert that the subpoena and hearings are part of petitioner Brodsky's 15-year vendetta against the Yankees. Respondents point to the dates on which Assembly Bills A1874, A508 and A7659 were introduced, and alleges that the placement of these bills into petitioners' Committees was "obviously designed as a fig leaf to give legitimacy to Petitioner Brodsky's personal investigation."

**18.** Respondents submit the affirmation of Jonathan D. Schiller, Esq., who states that the respondents have produced over 800 pages of documents, at a considerable cost. Respondents also submit the affidavit and reply affidavit of Lonn Trost, Esq., the chief operating officer and general counsel of the New York Yankees, who testifies that the construction of the Yankees Stadium took place over a number of years, and has required the creation of a massive number of documents. The final environmental impact statement was, itself, 700 pages. Mr. Trost testifies that documents related to the construction of the new stadium are not located in one location, and a search for responsive

in good faith, to narrow the subpoena and have delivered an extensive group of documents to petitioners,[19] (5) the subpoena is facially defective,[20] and (6) the subpoena was never served on the New York Yankees. Finally, respondents assert that the court's order to show cause, requiring the cataloging of respondents' documents, should be rescinded, based on the burden and cost it would take to produce such a catalog.

In opposition to respondents' cross motion and in further support of their order to show cause, petitioners assert that respondents, through their partial compliance, have waived their ability to challenge the subpoena. Petitioners point to the testimony of attorney Jonathan D. Schiller at the March 6, 2009 hearing, wherein Mr. Schiller states, "I am producing a partial response to your request."[21] Petitioners further argue that the Legislature, through Legislative Law § 62-a, has delegated the power to issue legislative subpoenas to its committees. Petitioners assert that the investigation which gave rise to the subpoena is an appropriate exercise of legislative authority.[22] Petitioners cite to the Speech or Debate Clause of New York State Constitu-

documents would be at a huge financial cost and would disrupt respondents' business. Mr. Trost estimates the cost of review of the approximately five million pages of electronically stored e-mail communications and related attachments, alone, would exceed $5.5 million. (*See also* transcript of June 1, 2009 hearing, at 70-72, 74, 75.)

19. Respondents assert that, after the subpoena was served, petitioner Brodsky failed to honor agreements to narrow the scope of the subpoena.

20. Respondents assert that the subpoena does not meet the procedural requirements of Civil Rights Law § 73 (2) in that Mr. Levine was never served with a copy of section 73 with the subpoena.

21. A more thorough reading of the March 6, 2009 hearing transcript reveals the following: At the March 6, 2009 hearing, attorney Schiller stated that he was "producing a partial response to your request consistent with the understandings that you and I have had over the past six weeks referring to the subpoena in our efforts to manage that production." Mr. Schiller further noted that "as you and I have discussed in the past, we have been working cooperatively, you and I, Richard, to address my concerns about the scope of the subpoena and to try and narrow or make the subpoena more manageable from the Yankees' standpoint . . . ." Mr. Schiller, on behalf of the Yankees, produced certain documents "[s]ubject to the objections that I have raised with you on correspondence and without waiving those objections, in partial production and in good faith I am providing, from the Yankees and from my files." (*See* hearing transcript regarding "Utilizing Public Financing for Construction of a New Yankee Stadium in New York City," conducted on Mar. 6, 2009, at 8, 9, 10.)

22. Petitioners attempt to distinguish *Matter of Costiglio v Strelzin* (98 Misc 2d 548 [1978]) by stating that, unlike the facts in *Strelzin*, in this case, Assembly Bills A1874, A508 and A7659 were referred by the Speaker of the Assembly to the Corporations Committee.

tion, article III, § 11 for the proposition that the acts of legislatures and their aides within the performance of their legislative functions are beyond judicial scrutiny.[23] Petitioners also assert that the Assembly bills were referred to the petitioners by the Speaker of the Assembly. Petitioners repeat that the subpoena is not overbroad and that the subpoenaed materials are relevant to the Committees' investigation. Petitioners submit that they have not singled out respondents for invidious treatment, and the subpoena is not rendered invalid merely because it requires the production of a substantial number of documents. Finally, petitioners argue that the respondents should be held in contempt for their failure to produce, for inspection by the court, a catalog of all documents and materials, as set forth in the April 22, 2009 order to show cause.

There are essentially two questions before the court: (1) did petitioners have the legal authority to serve a subpoena; and (2) if they had the authority, was the subpoena that was issued overbroad?

It goes without saying that not every citizen or governmental official may issue a subpoena. The power to issue judicial subpoenas is governed by article 23 of the CPLR. An agency or body proposing to issue a nonjudicial subpoena must show its authority, the relevancy of the items sought and some factual basis for inquisitorial action. (*Matter of Pharmaceutical Socy. of State of N.Y. v Abrams*, 132 AD2d 129 [3d Dept 1987]; *Matter of Crowley Foods v Lefkowitz*, 75 AD2d 940, 941 [3d Dept 1980]; *Myerson v Lentini Bros. Moving & Stor. Co.*, 33 NY2d 250 [1973]; *Matter of A'Hearn v Committee on Unlawful Practice of Law of N.Y. County Lawyers' Assn.*, 23 NY2d 916, 918 [1969]

---

**23.** New York State Constitution, article III, § 11 states that "[f]or any speech or debate in either house of the legislature, the members shall not be questioned in any other place." The Speech or Debate Clause includes protection for members of the Legislature as to committee meetings and hearings. (*People v Ohrenstein*, 77 NY2d 38, 54 [1990].) "Historically the Speech or Debate Clause serves to preserve the integrity of the Legislature by preventing other branches of government from interfering with legislators in the performance of their duties." (*Id.* at 54.) The clause's fundamental purpose is to assure that legislators can perform their legislative functions independently by shielding them from the consequences of being sued and the burden of having to defend themselves in court. (*Matter of Straniere v Silver*, 218 AD2d 80, 83 [3d Dept 1996].) Yet, this proceeding does not seek any relief against any individual member of the Legislature growing out of his or her legislative actions, and petitioners do not need any immunity under the Speech or Debate Clause because neither are being criminally prosecuted nor civilly sued based on their actions in the Legislature. (*Matter of Office of Governor of State of N.Y. [Winner]*, 20 Misc 3d 429, 432 [Sup Ct, NY County 2008].)

["no agency of government may conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered, especially with respect to subpoenas duces tecum . . . . There must be authority, relevancy, and some basis for inquisitorial action"].)

The law-making power given to the Legislature authorizes it, by inquiry, to ascertain facts which affect public welfare and the affairs of government. Such power of inquiry, with process to enforce it, is an essential auxiliary to the legislative function. (*Matter of Joint Legislative Comm. [Teachers Union]*, 285 NY 1 [1941]; *Matter of Kalkstein v DiNapoli*, 228 AD2d 28, 30 [3d Dept 1997].)

> " 'A legislative body may act upon common knowledge or information voluntarily contributed. At times it stands in need of more. There is then power to investigate by subpoena under the sanction of an oath.' (*People ex rel. Karlin v. Culkin*, 248 N. Y. 465, 478; . . . *Briggs v. Mackellar*, 2 Abb. Pr. 30 . . .)." (*Matter of Joint Legislative Comm. [Teachers Union]* at 8-9.)

Both the Committee on Corporations, Authorities and Commissions and the Committee on Cities are standing committees of the New York State Assembly, and their jurisdiction includes, but is not limited to, investigation into the subject matter of each bill or resolution referred to them by the Speaker. (*See* Rules of Assembly, rule IV, § 1 [a], [d].)[24]

> "Each standing committee shall propose legislative action and conduct such studies and investigations as may relate to matter within their jurisdiction. Each standing committee shall, furthermore, devote

---

**24.** "In considering any bill, a standing committee may vote favorably, unfavorably or to hold the bill for further action and/or study, provided, however, that a motion to hold which fails shall not be deemed to satisfy a request for consideration. Insofar as may be practicable, each standing committee shall vote upon such bills in the order in which such requests are filed, provided, however, that a chairperson may schedule the consideration of bills jointly if such bills deal with similar subject matter. Committees having original jurisdiction over bills upon which a request for consideration has been filed shall schedule all such bills for committee consideration by the third Tuesday in May of the second year of the term of the Assembly." (Rules of Assembly, rule IV, § 5 [a] [1].)

substantial efforts to the oversight and analysis of the activities, including but not limited to the implementation and administration of programs, of departments, agencies, divisions, authorities, boards, commissions, public benefit corporations and other entities within its jurisdiction." (Rules of Assembly, rule IV, § 1 [d].)

However, a finding that a committee has power to conduct an investigation does not mean it has unlimited power to issue subpoenas and obtain voluminous business records. (*Matter of Temporary State Commn. on Living Costs & Economy v Bergman*, 80 Misc 2d 448, 451 [Sup Ct, NY County 1975].) Indeed, section 73 (2) of the Civil Rights Law, entitled "Code of fair procedure for investigating agencies," provides that no person may be required to appear at a hearing or to testify at a hearing before a standing committee of the New York State Assembly,

"unless there has been personally served upon him prior to the time when he is required to appear, a copy of this section, and a general statement of the subject of the investigation. A copy of the resolution, statute, order or other provision of law authorizing the investigation shall be furnished by the agency upon request therefor by the person summoned."

Implicit in that section is that any investigation conducted has been first authorized by either a resolution, statute, order or other provision of law.

■ Rules of the Assembly, rule IV, § 1 (d) provides, in part, that each standing committee shall conduct such studies and investigations as may relate to matter within their jurisdiction. Rules of the Assembly, rule IV, § 5 (a) (1), entitled "Consideration of bills; requests by sponsor," provides that each standing committee may consider any bill referred to it at any time ("if otherwise in conformity with these Rules"), and may vote favorably, unfavorably or to hold the bill for further action and/or study. Under the Assembly rule, a bill referred to an Assembly standing committee is under the jurisdiction of that committee, which shall consider the bill and investigate accordingly. Notwithstanding the belated timing of Assembly Bill A1874 in relation to the commencement of the petitioners' investigation in 2008, once the bill was introduced and referred to the Corporations Committee by the Speaker of the Assembly, the Corporations Committee, and only the Corporations Committee, had the authority to conduct an investigation and, likewise, is-

sue a subpoena in furtherance of that investigation. To hold otherwise would impede the inherent power of the Legislature to conduct inquiries into proposed statutes.

Legislative Law § 62-a provides that

"[t]he chairman, vice-chairman or a majority of a legislative committee may issue a subpoena requiring a person to attend before the committee and be examined in reference to any matter within the scope of the inquiry or investigation being conducted by the committee, and, in a proper case, to bring with him, a book or paper. The provisions of the civil practice law and rules in relation to enforcing obedience to a subpoena lawfully issued by a judge, arbitrator, referee or other person in a matter not arising in an action in a court of record apply to a subpoena issued by a legislative committee as authorized by this section. Any member of a legislative committee may administer an oath to a witness."

Legislative Law § 62-a presupposes a lawful grant of authority and jurisdiction to the committee conducting a particular investigation. (*Matter of Costiglio v Strelzin*, 98 Misc 2d 548 [1978].)[25] And, while Legislative Law § 62-a does not constitute a grant of jurisdiction upon a legislative committee to conduct such investigations as they may choose to pursue, the Speaker of the Assembly's referral of Assembly Bill A1874 to the Corporations Committee on January 12, 2009 does provide the Corporations Committee with the legal authority to conduct public hearings into topics within its jurisdiction and issue

---

**25.** In *Costiglio v Strelzin*, the court quashed several subpoenas served on various New York savings banks. The legislative investigation at issue arose in the New York State Assembly Standing Committee on Consumer Affairs and Protection out of a concern that savings banks were withholding funds to force the Legislature to enact bills that would increase the interest rate ceiling on home mortgages. The court found that the Committee did not have express jurisdiction or authority over the subject matter of the investigation because there was no resolution, statute, order or other provision of law specifically authorizing the investigation. The court rejected the Committee's argument that authority to issue the subpoena was conferred under Legislative Law § 62-a. Furthermore, the court found that there was no bill before the Committee related to the regulation of New York savings banks. The court ultimately found that neither it nor the Committee could require production of documents by the plaintiffs since a committee without proper jurisdiction cannot issue enforceable subpoenas.

subpoenas to compel attendance and the production of documents.[26]

Thus, the Corporations Committee had the legal authority to issue the subpoena in question. The next issue is whether the subpoena that was actually issued is overly broad.

It is frequently opined that a motion to quash on relevancy grounds will be denied as long as the party issuing the subpoena duces tecum can show that the materials sought are not "utterly irrelevant" to the matter at hand. (*General Elec. Co. v Rabin*, 184 AD2d 391, 392 [1st Dept 1992]; *Westhoff v Bear Stearns & Co.*, 180 AD2d 543 [1st Dept 1992]; *Ayubo v Eastman Kodak Co.*, 158 AD2d 641, 642 [2d Dept 1990]; *Matter of La Belle Creole Intl., S.A. v Attorney-General of State of N.Y.*, 10 NY2d 192, 196 [1961].) However, this broadly stated standard, while consistent with a policy favoring the production of information, should not serve as an excuse to permit the subpoena power to be used as a tool of harassment or for the proverbial "fishing expedition" to ascertain the existence of evidence. (*Matter of Reuters Ltd. v Dow Jones Telerate*, 231 AD2d 337, 342 [1st Dept 1997].) Judicial incursion into the Legislature's exercise of its subpoena powers occurs " '[o]nly where the futility of the process to uncover anything legitimate is inevitable or obvious' " (*Matter of New England Petroleum Corp. v County of Suffolk*, 52 AD2d 926, 927 [2d Dept 1976], quoting *Matter of Edge Ho Holding Corp.*, 256 NY 374, 382 [1931]; *Matter of Kalkstein v DiNapoli*, 228 AD2d 28, 30 [1997]).

As justification for Assembly Bill A1874, the Committee states that "[w]ithout a measurable, identifiable, specific and significant public benefit, public financial assistance should not be given. This bill will protect public funds and ensure that a true public benefit will be achieved when large economic development projects are subsidized by New Yorkers." Because Yankee Stadium was indeed the recipient of public financing for its

---

**26.** Assembly Bill A508, introduced on January 7, 2009 and referred to the Corporations Committee on January 7, 2009, is not identified as the subject of the Corporations Committee's investigation in the January 12, 2009 subpoena. While the purpose of the subpoena includes investigation into legislation, "including, but not limited to" Assembly Bill A1874, that stated purpose is overbroad, and the subject of Assembly Bill A508 cannot form the basis for the Corporations Committee's subpoena. The court also notes that no Assembly bill was referred by the Speaker of the Assembly to the Committee on Cities, and accordingly, the Committee on Cities is without jurisdiction or authorization to conduct an investigation into the subject that is at issue in this action.

construction, it is a relevant area of inquiry to the Corporations Committee's consideration of Assembly Bill A1874, the stated purpose of which is to "ensure that projects that receive tax payer funding provide a true public benefit; including job growth and capital investments." (Assembly Mem in Support of NY Assembly Bill A1874.)[27]

The power to issue a subpoena compelling document production comes with the obligation to tailor any document requests with specificity so that the recipient can reasonably ascertain what documents to produce. Subpoenas should not be used as fishing expeditions. (*Matter of R.J. Reynolds Tobacco Co. [Mount Sinai School of Medicine]*, 136 Misc 2d 282, 284 [Sup Ct, NY County 1987]; *Matter of Sun Ray Cloak Co., Inc.*, 256 App Div 620 [1st Dept 1939]; *Matter of Reuters Ltd. v Dow Jones Telerate*, 231 AD2d 337, 344 [1997] [finding a subpoena "patently overbroad, burdensome, and oppressive" and noting that the subpoena did not "call for the files of specific officers of the company or for documents regarding limited or specifically defined subjects"]; *cf. Matter of Carvel Corp. v Lefkowitz*, 77 AD2d 872 [2d Dept 1980].)

I do believe that the Yankees have made a good faith effort to comply with the subpoena, culling through and producing a great deal of documents for inspection by the Corporations Committee. Testimony adduced at the June 1, 2009 hearing revealed that the respondents have in their possession over 400 boxes of documents which could be considered responsive to the

---

**27.** Other grounds for materiality, as stated in petitioners' application to this court, include that the documents are material to:

"[whether the Yankees] knew of, caused, or participated in the illegal manipulation of property tax assessments; how many permanent or temporary new jobs are created and what wages are being paid; whether Yankee ticket prices have the effect of excluding the vast majority of New Yorkers from access to a Stadium built with taxpayer money; how much the public was charged for free luxury tickets for public officials; whether City and State taxpayers were illegally deprived of tax revenues needed for other public purposes; the reason for delay in required parkland replacement, and many others."

Yet, Assembly Bill A1874 does not purport to investigate the conduct of a private entity applying for public financing as legal or illegal, but purports to set forth new requirements for public authorities in approving such financing. " '[N]o agency of government may conduct an unlimited and general inquisition into the affairs of persons within its jurisdiction solely on the prospect of possible violations of law being discovered.' " (*Matter of Kalkstein v DiNapoli*, 170 Misc 2d 165, 171 [Sup Ct, Albany County 1996], quoting *Myerson v Lentini Bros. Moving & Stor. Co.*, 33 NY2d 250, 256 [1973].)

subpoena in New York City, approximately 1,800 boxes of documents in Brewster, New York, and approximately 1.39 million electronically stored e-mails with attachments regarding the construction of the new Yankee Stadium, estimated to exceed 5.5 million pages. A strict wording of the subpoena would call for the production of every single one of these documents, simply an unreasonable task.

■ Mr. Brodsky has raised a very good point. We see around this country a growing practice of using public moneys to help fund the construction of stadiums used by privately owned sports teams. The propriety of using tax dollars for such purposes or granting "tax breaks" is certainly debatable, and Mr. Brodsky is right to bring this issue to the floor of the Legislature for public debate. The fact of the matter is, however, that the Yankees did not invent this practice—they are merely the latest in a long line of teams to apply for publically backed financing for new stadiums. The new Yankee Stadium was approved years ago by various public bodies, has been constructed, and is up and running. Requiring the Yankees to pack up every last document relating to the construction of the new stadium, amounting to hundreds of thousands of pages, load them literally into a tractor trailer and deliver them to the Legislature is neither reasonable nor productive of this goal. The subpoena is simply overly broad in its reach and should be quashed.[28]

---

**28.** The court rejects the respondents' argument that the subpoena should be quashed based on the allegation that the documents are or could be available from another source. It is unclear from the record that any other subpoena issued to a public authority, including the NYCIDA, would result in the production of duplicative documents. The court also finds that respondents' "partial compliance" with the subpoena, over respondents' attorneys' objections, and during negotiations to limit the scope of the subpoena, does not result in a waiver of respondents' ability to challenge the subpoena. The record reflects that respondents reserved their rights to object to the subpoena substantively and procedurally upon its issuance. By correspondence dated January 12, 2009, attorney Schiller acknowledged the subpoena directed to Randy Levine. By correspondence dated January 13, 2009, attorney Schiller agreed to accept service of the subpoena on behalf of respondents, and reserved all the respondents' rights to object to document requests "on any applicable substantive or procedural basis." In that correspondence, attorney Schiller stated that the subpoena's request for the production of documents on one business day's notice was unreasonable. By correspondence dated January 23, 2009, attorney Schiller acknowledged the parties joint effort to narrow the scope of the subpoena. By correspondence dated February 6, 2009, without waiving any of respondents' rights, attorney Schiller provided responses to certain requests for information. By correspondence dated March 6, 2009, attorney Schiller objected to petitioners' additional requests for information on

Accordingly, it is hereby ordered, that petitioners' application seeking an order to compel the respondents New York Yankees and Randy Levine to comply with the legislative subpoena issued by the petitioners on January 12, 2009 is hereby denied; and it is further ordered that respondents' cross motion, insofar as it seeks an order quashing the January 12, 2009 legislative subpoena, is hereby granted; and it is further ordered that respondents' cross motion, insofar as it seeks an order modifying the April 22, 2009 order to show cause to rescind that portion that directs the respondents to produce a catalog of documents on the return date of this proceeding, has been rendered moot; and it is further ordered that, that part of respondents' order to show cause dated May 21, 2009, seeking an order enforcing a subpoena served on petitioner Brodsky on May 20, 2009, has been rendered moot.

---

grounds of irrelevance, overbreadth and undue burden, and agreed to produce documents without waiving any objections. By correspondence dated March 27, 2009, attorney Schiller questioned the legislative purpose of the subpoena and advised petitioner Brodsky that the subpoena was overbroad. "[W]ith a full reservation of all of our rights," in good faith, respondents produced a number of documents and agreed to negotiate with petitioners to narrow the subpoena's scope.